# PORTLAND GENERAL ELECTRIC COMPANY
*v.*
## DEPARTMENT OF REVENUE

Alfred H. Stoloff and John C. Edwardsen, Phillips, Coughlin, Buell, Stoloff & Black, Portland, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered March 1, 1977.

CARLISLE B. ROBERTS, Judge.

The plaintiff is an electric utility and its operating property is "Centrally assessed" by the defendant, the Department of Revenue (not by the county assessor), pursuant to ORS 308.505 to 308.730.

Defendant's assessment roll respecting plaintiff's operating property for the assessment date January 1, 1976, was delivered to the director of the department (ORS 308.585) on the second Monday in June 1976, and reviewed by the director (ORS 308.590), at which time changes were made in the assessment in several respects. Plaintiff petitioned the director for a reduction in value of some of the items of property assessed, a hearing was held on the petition on July 1, 1976, and the director's Order No. A&AU-76-35 was issued on July 5, 1976, granting only partial relief. Appeal was timely filed in this court pursuant to ORS 308.620.

Ad valorem property assessment for taxation of operating property of electric utilities and other designated utilities and companies within the purview of ORS 308.505 to 308.730 differs in a few notable respects from assessment of properties regularly valued by the county assessor. Ordinarily, the county assessor determines values of real and personal property included in the definitions contained in ORS 307.010 and 307.020, which exclude intangible personal property. However, because the property of a regulated interstate utility in Oregon is rarely, if ever, sold as a going concern and its income is regulated by the Federal Power Commission and the Oregon Public Utility Commissioner, the usual approaches to value are deemed insufficient. The statute provides that the appraisal shall include consideration of intangibles such as franchises, shares of capital stock authorized and issued, the value of bonds and other obligations of

indebtedness and the like. However, throughout the pertinent statute, the legislative intent is clearly expressed that, even if the property as a unit is appraised, the tax imposed under ORS 308.505 to 308.730 must be confined to "property having a situs in this state" (ORS 308.505(3) and 308.515), "used or held" "for or in use in the performance or maintenance of a business or service" within this state (ORS 308.510), and these restrictions apply to "work in progress." ("Work in progress" is a technical term of importance in the work of the Public Utility Commissioner. In this suit, it must constantly be held in mind that the object of the pertinent statutes is to assess property for ad valorem taxation and not for the purpose of setting a rate of return measured by the utility's capital investment and other factors.)

Three issues or causes of suit (with estimated tax impacts of $460,000, $274,000, and $375,000, respectively) were presented for the court's determination. Certain facts were stipulated by the parties with respect to each issue.

The first issue is: Do uncompleted and unaccepted construction plans and specifications, in the possession, ownership and control of an independent, out-of-state engineering corporation which is devising and designing them specifically for plaintiff, under a contract, constitute taxable personal property of the plaintiff in Oregon? Defendant's position is that such plans and specifications constitute "work in progress" and are intangible properties which have a situs for taxation in and must be taxed by Oregon. (1976 is the first assessment year in which this position has been asserted by the defendant.) As to this first cause of suit, the parties have stipulated:

> "In preparing for construction of a nuclear generating plant in Gilliam County, Oregon, and a coal-fired generating plant in Morrow County, Oregon, plaintiff contracted with an out-of-state engineering firm for the design of the plants. The work in preparing the plans

and specifications was primarily performed outside the State of Oregon.

"As of January 1, 1976, plaintiff had advanced the out-of-state engineer $30,636,262 for time spent. The $30,636,262 has been included in the plaintiff's construction work and progress account.

"Defendant assessed plaintiff on the advances made to the out-of-state engineer in the amount of $30,636,262. By petition to defendant dated June 11, 1976, plaintiff sought to reduce its assessment by $22,901,350 contending that such portion of the work in progress was not taxable to plaintiff. Defendant held a hearing * * * and denied the requested relief * * *."

Some plans and specifications had been delivered by the contracting engineering firm to the plaintiff and had been accepted by it before January 1, 1976, accounting for the $7,734,912 of the contract price not disputed by the plaintiff and have been treated by the defendant as work in progress and allocated to Gilliam and Morrow Counties in Oregon.

Plaintiff argues that the payment of $22,901,350 represented advance payments to the California engineering firm for the preparation by it and delivery to the plaintiff in Oregon of movable, tangible personal property, to be delivered to the plaintiff only on completion, and that none of such plans and specifications were completed as of January 1, 1976, or accepted by the plaintiff and that they were not physically located in Oregon or owned by or in possession of or within the control of the plaintiff.

 The testimony before the court showed that not only was the "work in progress" in the custody and control of the engineering firm but that it was also owned by that firm. There was no contractual provision giving plaintiff an ownership right in the work in progress. Such right would arise only upon delivery to and acceptance by the plaintiff of the finished plans and specifications according to contract. Completed plans and specifications qualify as "goods" under the

Uniform Commercial Code, and ORS 72.4010(2) specifically provides that:

> "(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, * * *."

Under this statement of facts, it appears to the court that all plaintiff can claim for its substantial advancement of cash for uncompleted work is a chose in action, an intangible—a right to receive the plans and specifications upon completion or, upon failure thereof, to recover a sum of money (more probably than not by an action taken in the California courts). The engineering firm, in California, owned its work papers and their situs was in that state; the plaintiff could only claim a right to unliquidated damages on a breach of contract, a chose in action to be exercised in a jurisdiction in which the contracting party could lawfully be served with summons.

Defendant relies upon its interpretation of ORS 308.510 and 308.515 as giving it a duty to assess under these facts because ORS 308.510(1) defines "property":

> "(1) 'Property,' as used in ORS 308.505 to 308.730, includes all property, real and personal, tangible and *intangible, used or held* by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service * * *." (Emphasis supplied.)

■ The intangible referred to could be a franchise (a word used in the same subsection). But it must be in use or possession. ORS 308.515 restricts the defendant, in making its annual assessment, to "the following property *having a situs in this state*:

> "(a) * * * any property *used or held* for its own future use by any company in performing or maintaining any of the following businesses or services * * *: * * * * electricity; * * *." (Emphasis supplied.)

The court cannot find that the chose in action here considered, as of January 1, 1976, was "used or held" in plaintiff's business or had a situs in this state on

January 1, 1976, as required by ORS 308.505(3) and ORS 308.515(1).[1]

■ A government, when imposing a tax, is exercising one of sovereignty's greatest powers. The scope of the imposition should be clearly expressed. The intention to tax a particular class of persons or a type or kind of property should be readily discernible in the statute without the need to resort to the more subtle rules of construction. Therefore, it is unlikely that the Oregon legislature could have intended to tax the executory contract here considered. As stated in *Didier v. S.I.A.C.,* 243 Or 460, 465, 414 P2d 325, 327 (1966):

> "When possible, legislation is to be construed so that it will carry out its revealed legislative purpose. If the legislative purpose is unclear from the language of the section under examination, courts are required to give to the section a meaning that comports with common sense and with the statutory scheme as a whole. * * *

> "Construction should avoid inconsistent and unconscionable results. * * *"

Defendant has cited A. Marston and T. Agg, *Engineering Valuation* (1st ed, McGraw-Hill, N.Y., 1936), at 13:

> "1.32. *Intangible Value.*—The intangible value of a

---

[1] Plaintiff recognizes that the completed plans and specifications are a valuable asset, essential after delivery for use in soliciting bids for construction. In its invitation for bids on aspects of construction, utilizing the completed work of the California engineering firm, plaintiff included the following caveat:

"The Bidder is hereby notified that Regulatory Licenses and Permits are a restraint upon the Pebble Springs Nuclear Plant project site work. The site start date is dependent upon receipt by Portland General Electric of both the State of Oregon Site Certification and the Nuclear Regulatory Commission Limited Work Authorization (LWA). The continuation and completion of the site work is further dependent upon receipt by Portland General Electric of the Nuclear Regulatory Commission Construction Permit for the project."

The applications for regulatory licenses and permits were under consideration on January 1, 1976, and no decision had been reached at the time of this suit. Plaintiff urges these facts as evidence that the work in progress should be assessed at a fraction of its cost. The whole project may be a loss because the siting of the plants remains to be approved. However, with respect to the uncompleted and completed work, the contract price is still the best evidence of value, the price presumably having been approved by plaintiff in full recognition of the risk.

property is the value of that part of the property which does not have a physical existence. The intangible values include

"1. *Preliminary-expense Value.*—This is the fair present capital allowance which should be made for the actual legitimate expenses incurred for the organization and promotion of the enterprise before construction of the property can begin (Secs. 12.1 to 12.8)."

Neither this nor the paragraph cited therein aid in answering the present question. Nor are defendant's citations of *Curry v. McCanless,* 307 US 357, 59 S Ct 900, 83 L Ed 1339, 123 ALR 162 (1939), and *State v. Northwest Airlines,* 313 Minn 395, 7 NW2d 691 (1942), of aid to the court. *Curry* stands for the proposition that intangibles may be taxed by one or more states but does not show that the intangible here being considered comes within the provisions of ORS 308.505 to 308.730, nor does the *Northwest Airlines* case.

 The defendant's reference to the alleged inclusion of the plaintiff's "work-in-progress" account in its rate base for public utility purposes is not relevant here. The specific nature of the property must be examined *for ad valorem tax purposes.* (Defendant's argument also overlooks the fact that the regulatory scheme of the Public Utility Commissioner does not allow plaintiff to receive a return on its construction work-in-progress account, but only on plant which is physically in service.)

The plaintiff's contentions are sustained by the court on the first cause of suit.

The issue in the second cause of suit is stated by the plaintiff thus: To the extent that the plans and specifications (described in the first cause of suit) for construction of the nuclear generating plant and coal-fired generating plant are found to be taxable to plaintiff as personal property (which is not conceded by plaintiff), does the Department of Revenue have authority to apportion the assessed value to counties

other than those in which the plants are being constructed? Defendant states the issue: Is the allocation by the director of the construction work in progress of $7,734,912 to Gilliam and Morrow Counties and of $22,901,350 to the system as a whole, proper?

The parties have entered into a stipulation with respect to this cause as follows:

> "The defendant, Department of Revenue, initially apportioned the assessment contested under the First Cause of Suit to Gilliam and Morrow Counties, according to the location of the generating facility for which the plans and specifications were being prepared.
>
> "The initial apportionment was communicated to plaintiff by letter dated June 21, 1976, and the same apportionment was made on the assessment roll delivered to the Director, Department of Revenue, pursuant to ORS 308.585—308.590. Subsequent to said delivery, the Director reapportioned approximately $24,000,000 of the assessed value to counties other than Gilliam and Morrow.[2] This reapportioned value consists primarily of the assessed work in progress contested under plaintiff's First Cause of Suit, and the effect of this reapportionment was to increase plaintiff's taxes by approximately $274,000.
>
> "* * * * *
>
> "It is acknowledged that in previous years expenses for plant engineering, such as those contested herein, have been consistently allocated to the county in which the facility is to be constructed."

■ ORS 308.565 makes provision for the difficult problem of apportionment of the assessed values of a statewide utility among Oregon counties. A reading of the six subsections contained in the statute shows an intent to establish rough rules of thumb. For example, subsection (2) provides that "[v]alues distributed over wire, * * * shall be apportioned to the counties in which the lines * * * are situated by

---

[2]This reapportionment, a novel one according to the testimony, indicates a question in the minds of defendant's agents as to the nature of the "property" being apportioned. They recognized that it was something other than the work product included in the $7,734,912 figure—but what? Conceptualism is pertinent in this suit!

multiplying the rate per mile in each case, * * * by the number of miles of the wire, * * * in each county, respectively." However, subsection (4) sets up a different rule for power plants and dams:

"(4) As determined by the department values of electric power plants and water powers, connected with or used in the operation and business of any company, assessable under ORS 308.505 to 308.730, may be apportioned to the counties in which the same are situated, in such manner as the department deems reasonable and fair."

■ The department has regularly allocated these large capital structures to the counties in which they are situated. The court finds that this apportionment follows the legislative intent and that it should be continued.

ORS 308.565, recognizing the problems implicit in the apportionment of values between counties in these cases, gives to the department a degree of discretion, to be exercised as the department deems "reasonable and fair." In the case of the plans and specifications costing $7,734,912 which had been prepared by and accepted from the California engineering corporation, constituting tangible personal property with a situs in Oregon, an argument can be made that they added value to the whole system in that state of their usefulness (*i.e.,* as a basis to obtain bids), rather than to two counties only, since the Oregon situs of the paper was not necessarily physically in the county for which the plans and specifications had been prepared and for which they were uniquely designed. However, it is readily seen that if, upon later construction, the regular rule with regard to the location of power houses and dams was followed, and the large amounts of value allocated at first to the entire system were subsequently concentrated in two counties, it would effect a serious distortion in the tax bases of the several taxing districts, both within and without the counties of construction. The change from a system allocation to a site allocation would be unsettling and

[ 42 ]

detrimental. The court concludes that the legislature did not intend such a result, predictably capable of creating fiscal emergencies for local governments. The defendant's consistent use of its discretion as exercised hitherto seems "reasonable and fair."

The issue of the assessment and apportionment of the $7,734,912 above described is not before the court. As to the $22,901,350 of advance payments made by the plaintiff to the out-of-state engineering corporation and as to which, as of January 1, 1976, plans and specifications had not been completed, delivered or accepted in Oregon, the court's decision in the first cause of suit is applicable. There is no value to be taxed and consequently there is no problem of or need for apportionment.

For its third cause of suit, plaintiff contends that its inventories of fuel oil and nuclear fuel on hand as of January 1, 1976, held by the plaintiff electric utility "for conversion into electricity," meet the definition of "inventory" and should be taxed at a reduced rate pursuant to ORS 310.608(3). Defendant denies that either the fuel oil or nuclear fuel, as used in plaintiff's business of producing electricity, meet the statutory definition of inventory as defined in the section cited. The parties have stipulated:

> "As a regular part of its business of selling electricity, plaintiff buys and stores large amounts of fuel in the form of oil and nuclear fuel. This fuel was assessed by defendant on January 1, 1976, at a value of $47,657,100. This figure represents 100 percent of assessed value. By petition to defendant dated June 11, 1976, plaintiff sought to reduce the assessed value of its fuel stores by 60 percent, on the basis that such stores are inventory and thus subject to the 'inventory phase out' of ORS 310.608. It is acknowledged that the raw fuel inventories of natural gas distributors and heating oil distributors qualify as inventory under the statute. * * *"

The pertinent parts of the statute to be construed, ORS 310.608, read as follows:

> "(1) There shall be exempt from taxation a percen-

tage of the true cash value of the taxpayer's inventory as indicated for each tax year beginning on July 1 of the following years: * * * [1975, 50 percent; 1976, 60 percent.]

"(2) For tax years beginning on July 1, 1980, and thereafter, all inventory shall be exempt from ad valorem taxation.

"(3) As used in subsection (1) of this section, 'inventory' means farm machinery used in the planting, cultivating, or harvesting of farm crops, all livestock and items of tangible personal property described as materials, supplies, containers, goods in process, finished goods and other *personal property owned by or in possession of the taxpayer, that are or will become part of the stock in trade of the taxpayer held for sale in the ordinary course of his business."* (Emphasis supplied.)

"Inventory" is a word of many meanings, as shown by any unabridged dictionary (running from an "itemized list of current assets" to "a survey of natural resources," and including "a list or schedule of raw materials, supplies, work in process, and finished goods on hand as of a given date" and "a list of merchandise held for sale"). In accounting procedures, "inventory" is an important element of both the balance sheet and of the statement of income. In accounting, there are several methods and techniques for measuring and valuing inventory. Fortunately, in this instance, the statute has given us a definition, but it is one which requires careful scrutiny and evaluation. It is a special definition, indeed, containing three classes of property but the first two, farm machinery used in planting, cultivating or harvesting of farm crops, and "all livestock" can, of course, be disregarded for the purposes of this suit.[3]

_____

[3]The first two categories have some importance for purposes of legislative construction, indicating as they do that the legislative tax committees were wide ranging in their consideration of the definition of "inventory" in subsection (3). Normally, farm machinery used in planting, cultivating or harvesting of farm crops is a depreciable item and would never be contemplated as an inventory item in the same way as a stock of goods held for sale in the ordinary course of business. "Livestock" can be

██ ██ The third category is a typical definition of an important and reasonably specific area of what is commonly understood as inventory. It has breadth in that it applies to the whole commercial chain; *i.e.,* the minerals, fiber, grain and the like supplied to the manufacturer, the finished goods sold by the manufacturer to the assembler, the assembled goods to the wholesaler, and on to the ultimate consumer. Each user of the goods may be a consumer in some degree but the words "stock in trade * * * held for sale in the ordinary course of his business," apply only to those items of tangible personal property which leave his possession and are delivered to the next purchaser. Consequently, packaging used by the original supplier, whether railway gondolas or farmer's lug boxes, not sent on to the next purchaser, are not "inventory" under ORS 310.608(3). Many other illustrations could be given.[4]

Plaintiff has used an ingenious argument to bring itself within the purview of subsection (3)'s "materials * * * that are or will become part of the stock in trade of the taxpayer held for sale in the ordinary course of his business." Plaintiff's testimony on this point is summed up in its Opening Pre-Trial Brief, at 13-14:

"Energy is the stock in trade of a utility. The sources of energy can take various forms—coal, oil, uranium, gas, electricity, and many others—but all share the common quality of identification with their energy equivalents in BTU's (British Thermal Units). In the energy industry, the various energy sources are com-

---

inventory but ordinarily a distinction is made between the herd of cattle and those classifications of brood stock and dairy stock which are a depreciable capital item.

In construing statutes, courts will attribute to words their customary or popular sense or their technical meaning if a technical word is used. But, since legislative intent must be ascertained and followed, courts recognize the legislative power to give a new definition to an old word for the purposes of a particular statute and such definition will be made effective if understandable.

[4]This principle is constantly used in sales tax cases where the determination of the "ultimate consumer" is significant.

monly valued and identified in terms of BTU's, since that is the relevant description and primary value of the raw material. In each case, however, the utility simply extracts the energy from the source and sells it to the consumer. It is important to conceptualize the energy marketing process. Prior to delivery, the latent energy is stored in various forms—here, oil and nuclear fuel. Through an extraction process, the *existing energy* is released in the form of electricity. The energy is not manufactured; rather, it simply flows from its original state, through a conversion process, to the consumer. The same energy which is purchased by the electric utility in the form of fuel is sold to the consumer in the ordinary course of the utility's business. Consequently, the raw fuel of an electric utility is clearly '. . . property that [is] part of the stock in trade of the taxpayer held for sale in the ordinary course of his business.' "

■ The court does not impugn the plaintiff's scientific theory that the potential energy in the fuel oil or the nuclear fuel (or, for that matter, the potential force of gravity of released water which flows through penstocks to impel turbines which activate generators) is simply "extracted" and "flows," unchanged, from its matrix, through a conversion process, to the consumer. The layman, however, would consider the energy produced from the oil or from the nuclear fuel as being expended in the generation of steam which activates a turbine which, in combination with a generator, produces the electric current which is carried to the consumer. The energy received (nonstorable except in miniscule quantities) is the product purchased by the consumer, in the lay mind. The original "packaging" of the energy (*e.g.,* nuclear fuel) is of no importance. A "service," not a tangible product, is being purchased. This is the concept which the court attributes to the legislator.

■■ The problem of the court in construing a statute is to ascertain what the legislature intended from the language used, with such aid as may be found in rules of interpretation and legitimate extrinsic sources. The judge's duty is to construe statutes, not to

enact them. The court must declare what the legislature has done and not what it should have done. *Sunshine Dairy v. Peterson et al.,* 183 Or 305, 193 P2d 543 (1948); *Fullerton v. Lamm,* 177 Or 655, 163 P2d 941, 165 P2d 63 (1946). Interpretation here is required because of the different meanings accorded to "inventory," "stock in trade," and even "ordinary course of business."

Another rule of statutory construction which has long been followed in Oregon is that, in the matter of tax exemptions, Oregon traditionally has been a "strict construction" state. There is no question but that ORS 310.608 is a quasi-exemption at the present time and will presently be a full exemption of property from tax (unless otherwise amended by the legislature). *See* the cases cited in *Emanuel Lutheran Char. v. Dept. of Rev.,* 4 OTR 410, 415-416 (1971).

In construing a statute, words of common use are to be given their natural, plain and obvious meaning rather than any curious, narrow or hidden sense which strains the credulity of the typical reader (even though true). *State ex rel Nilsen v. Ore. Motor Ass'n,* 248 Or 133, 432 P2d 512 (1967); *State Finance Co. et al v. Dept. of Rev.,* 5 OTR 651 (1974); *Hanna Mining v. Commission,* 2 OTR 389 (1966), *aff'd,* 247 Or 389, 430 P2d 563 (1967); *Snellstrom v. Commission,* 2 OTR 56 (1964); *Field Emission Corp. v. Commission,* 1 OTR 243 (1963); and *Jarvie v. Commission,* 1 OTR 1 (1963).

The court concludes that the electrical energy transmitted by plaintiff may not be equated with nuclear fuel and oil used in its generating processes and not delivered to the consumer in kind.

Plaintiff calls attention to the fact that other energy sources delivered to the consumer in kind (coal, oil, gas) are accorded the preferred inventory status under ORS 310.608(3) and the exclusion of plaintiff's fuel oil and nuclear fuel would unjustly discriminate against the electric utility.

[ 47 ]

 The legislature's power to classify is broad and will not be upset except for very cogent reasons, which have not been shown here. The fact that natural gas and fuel oil, delivered to the ultimate consumer, can be classified as "inventory" under the ORS 310.608(3) definition and that the same fuel, used by an electric utility for its own purposes is not so classed, is not discriminatory per se. Discrimination can be proved only upon a complete examination of the impact upon competing businesses. Plaintiff's record is insufficient for that purpose.[5] Every business has its inherent advantages and handicaps.

Defendant has chiefly relied upon *Oregon Portland Cement Co. v. Dept. of Rev.,* 262 Or 617, 500 P2d 1044 (1972), *aff'g* 4 OTR 545 (1971), which construed the present ORS 310.608(3). Although the case does not meet the present question head on, the decision negates the plaintiff's theory of the flow of energy from fuel oil or nuclear fuel, unchanged, to the electrical energy used by the ultimate consumer, and the decision illustrates what is believed by this court to be the legislative intent of the statute.

The defendant's Order No. A&AU-76-35 is affirmed as to the third cause of suit.

Plaintiff shall prepare a decree pursuant to the court's Rule 27 and in accordance with the court's decisions herein. In the preparation of the decree, possible use of Rule 26 shall be taken into consideration. Each party shall bear its own costs.

---

[5]There are many cases, old and new, illustrating the legislature's freedom to classify, even when using narrow grounds, and the court's support thereof; *e.g., Madden v. Kentucky,* 309 US 87, 60 S Ct 406, 84 L Ed 590 (1940); *Weinberger v. Rall,* 265 Or 597, 510 P2d 549 (1973); *Jarvie v. Commission,* 1 OTR 1 (1963). *Freightliner Corp. v. Dept. of Rev.,* 275 Or 13, 549 P2d 662 (1976), suggests the heavy burden of proof placed on plaintiffs in a case of alleged discrimination.