# IN THE OREGON TAX COURT

## BAIN
*v.*
## DEPARTMENT OF REVENUE
## OREGON AQUA-FOODS, INC.,
*Intervenor*
## (TC 1393)

Dana A. Anderson, Assistant County Counsel for Lane County, Eugene, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Department of Justice, Salem, represented defendant.

John C. Caldwell, Hibbard, Caldwell, Canning, Bowerman & Schultz, P.C., Oregon City, represented intervenor.

Decision for plaintiff rendered April 15, 1981.

**CARLISLE B. ROBERTS, Judge.**

The Director of Assessment and Taxation for Lane County, Oregon, has appealed from the Oregon Department of Revenue's Order No. VL 80-41, dated March 5, 1980. The Attorney General has undertaken to defend the order and has been joined by the interested taxpayer, Oregon Aqua-Foods, Inc., as intervenor.

The sole issue presented is whether certain improvements located on Section 20, T 17 S, R 2 W, WM, owned by the intervenor (more particularly described in Instrument No. 7724377, Reel 844R, Lane County), were exempt from real property taxation, pursuant to the provisions of ORS 307.330 and 307.340, on the assessment date of January 1, 1978. The decision depends upon whether the improvements are properly described as "nonmanufacturing" facilities or "nonmanufacturing" property, as those terms are used in the cited statutes, or are held to be manufacturing facilities. The true cash value of the facility and its underlying land, $4,752,200, is not in dispute.

As stated by the plaintiff in his opening brief:

"There is no dispute on the facts in this case as all parties recognize that the intervenor, Oregon Aqua-Foods, Inc., operates a salmon hatchery near Springfield, Oregon, as a part of which operation intervenor employs rather sophisticated mechanical, chemical and electronic processes in the commercial raising of salmon."

The intervenor accepts this statement. The defendant's opinion contains an eloquent description of the improvements and

use, constituting a good summary of the intervenor's testimony at the trial.[1]

---

[1] "Petitioner produced two witnesses in its employ: Daniel A Hartsook, Financial Manager, and William J. McNeil, General Manager and Vice President. Both gentlemen testified in great detail about the purposes, processes, and attributes of the subject property. Numerous photographic exhibits were produced.

"Petitioner is a wholly-owned subsidiary of Weyerhaeuser Corporation. It is described as an 'ocean ranching company.' The subject property is markedly dissimilar to normal and ordinary fish hatcheries and contains a rigorous environmental control system. It is the largest operation of its type in the world.

"Waste water is obtained from the nearby Weyerhaeuser pulp mill. This heated water is blended with cold water and disinfected by chlorination. The residual chlorination is later removed. Temperature control of the water is crucial; there are variations between each of the 36 raceways on the subject property. It is a computerized operation.

"The release and recapture sites are located on the Oregon coast. After entering the recapture site, the salmon brood stock are held in salt water ponds until reaching maturity. This is from four to six weeks for Coho salmon. The eggs are then removed and artificially fertilized. These, then, are transported to the subject property in Springfield for incubation. Usually, they are then quarantined and held in isolation for approximately 21 days. Subsequently, they are placed in the hatchery raceways.

"The hatching, itself, was described in great technical detail. It is a highly complex and intriguing process. The release of a 'hatching enzyme' weakens the egg shell and the embryo escapes.

"A PhD in nutrition is on Petitioner's staff. Certain diets are essential; food is specially designed for Petitioner's operation. Pathology and research and development laboratories are present at the subject property. They are supported by groups in the state of Washington.

"Along with the disinfection of the water, all of the fish are vaccinated to protect against disease. More than 12 million juvenile salmon were vaccinated in 1978; more than 20 million were expected for 1979. Of all the fish released, over 500,000 were tagged for identification by Petitioner. The precise release dates are determined by observation, experimentation, and scientific techniques. The survival and actual return rates from the ocean after release are much greater for Petitioner's operation than occurs in nature.

"Because of the disease prevention measures undertaken, Petitioner's salmon are much more resistant than those produced in nature. Petitioner's products may be differentiated by their bone structure. Petitioner's witness testified that the quality of the subject property's salmon is much greater than 'natural' fish; more survive to be harvested. Additionally, much better growth rates are obtained due to the specialized dietary measures. At the subject property, a salmon may double its body size approximately every 20 days.

"The respondent produced no witnesses. Instead, he relied solely on legal arguments with no dispute as to Petitioner's factual testimony about the complex, technical process."

■  The applicable statutes are ORS 307.330 and 307.340, which read:

"(1)  Except for property centrally assessed by the Department of Revenue, each new building or structure or addition to an existing building or structure is exempt from taxation for each year of not more than two consecutive years if the building, structure or addition:

"(a)  Is in the process of construction on January 1;

"(b)  Is not in use or occupancy on January 1;

"(c)  Has not been in use or occupancy at any time prior to such January 1 date;

"(d)  Is being constructed in furtherance of the production of income; and

"(e)  *Is, in the case of nonmanufacturing facilities, to be first used or occupied not less than one year from the time construction commences.* Construction shall not be deemed to have commenced until after demolition, if any, is completed. (Emphasis supplied.) (ORS 307.330.)

"The property described in ORS 307.330 shall be listed for ad valorem taxation, but the assessor shall cancel the assessment upon receipt of sufficient documentary proof that the property meets all of the conditions contained in ORS 307.330. Such proof shall be filed with the assessor on or before April 1 of such year. No cancellation of assessment shall be made unless the required proof is filed within the time prescribed by this section. Any cancellation of assessment will be abated as to any nonmanufacturing property that is used or occupied within one year from the time construction commences and the assessor shall proceed to correct the assessment and tax roll or rolls from which the property was omitted from taxation, in the manner provided in ORS 311.207 to 311.213." (ORS 307.340.)

The parties agree that construction of the subject property began in May 1977 and was completed in February 1978, a period of less than one year. On January 1, 1978, the hatchery met the basic requirements of ORS 307.330(1)(a),

(b), (c) and (d). The issue arises under ORS 307.330(1)(e) and the last sentence of ORS 307.340. If the subject property is a "nonmanufacturing" facility, no tax exemption can be granted.

The word "manufacturing" appeared in the original statute (1959 Or Laws ch 246.) It was not used in the legislative amendment found in 1961 Or Laws ch 552, but the parties herein accept "manufacturing" to be the converse of "nonmanufacturing," which word was retained in the applicable amended statute. Consequently, only if the property is proved to be a manufacturing facility, as contended by defendant and intervenor, is the tax exemption applicable.

It was recently stated in another decision, *Hahn v. Dept. of Rev.*, 9 OTR 25, at 29 (1981):

> "Exemptions, deductions, credits and offsets in taxation are matters of legislative grace. There is no presumption of implied exemption. *Skyline Assembly of God v. Dept. of Rev.*, 274 Or 259, 545 P2d 879 (1976); *Roy Mobile Homes, Inc. v. Dept. of Rev.*, 7 OTR 95 (1977). In the matter of tax exemptions, Oregon traditionally has been a 'strict construction' state; taxation is the rule exemption is the exception. *Emanuel Lutheran Char. v. Dept. of Rev.*, 4 OTR 410, 415 (1971); *aff'd* 263 Or 287, 502 P2d 251 (1972). The standard has been euphemistically stated as 'strict but reasonable.' *Mult. School of Bible v. Mult. Co.*, 218 Or 19, 27, 343 P2d 893, 897 (1959). [*See* O'Connell, J., dissent in *Willamette Univ. v. Tax Commission*, 245 Or 342, 349-351, 422 P2d 260 (1966).] We are here dealing with a provision for exemption from taxation and the foregoing rules must be applied."

Mr. William J. McNeil, a fishery biologist and the general manager of the subject property, testified that the extensive environmental control resulted in a production of mature salmon at four times the rate of a typical hatchery, therefore the subject property was not a hatchery but a *manufacturing* facility. Upon cross-examination, Mr. McNeil admitted that the intervenor's methods accelerated the natural processes but actually produced nothing that does not occur in nature.

There are scores of decisions which define the words "manufacturing" or "manufacturer." Counsel have cited a number of pertinent cases involving exemptions from taxation granted to taxpayers engaged in "manufacturing," involving natural products (chickens, fish, coffee, beer, wine, hogs, mice). However, such cases must be carefully scrutinized because the decisions in a number of them turn on differing and often very broad statutory definitions of "manufacturer" or "manufacturing."

■     The court notes particularly that in the Oregon statute there is no defintion of "manufacture," "manufacturing," or "nonmanufacturing." The words used must therefore be regarded as common words and not words of art. When a common term is used in the statute, it should be given its common meaning. The legislature's failure to consider or deal with the particular problem will not prevent courts from construing a legislative act as having a meaning which is consistent with common sense and with the overall purpose of the act. *State v. Shumway*, 44 Or App 657, 607 P2d 191 (1980). In interpreting a statute, the court must begin with the language used and is bound to give words of common usage their natural, ordinary meaning unless that leads to an absurd or unreasonable result. *Photo-Art Commercial Studios, Inc. v. Hunter*, 42 Or App 207, 600 P2d 471 (1979); *Oregon Oyster Co. v. Dept. of Rev.*, 7 OTR 308 (1978). Words of common use are to be given their natural, plain and obvious meaning, rather than any curious, narrow or hidden sense. *Portland Gen. Elec. Co. v. Dept. of Rev.*, 7 OTR 33 (1977).

"Made by hand" is the opposite of "developed by natural processes."[2] Webster's Third New International Dictionary, Unabridged, defines "manufacture" as something made from raw materials by hand or by machinery; the process or operation of making wares or other material products by hand or by machinery, especially when carried on systematically with division of labor; a productive industry using mechanical power and machinery. The American

---

[2] Intervenor's counsel gives the translation of the Latin roots of "manufacture," "Things which are made by hand," leading to a paradox: Is a live fish made by hand?

Heritage Dictionary of the English Language defines "manufacture": to make or process a raw material into a finished product, especially by means of a large-scale industrial operation; to make or process a product, especially with the use of industrial machines; to create, produce or turn out in a mechanical manner ("his books seem to have been manufactured rather than composed"). To concoct or invent; fabricate; to make or process goods, especially in large quantities and by means of industrial machines.

Other courts have been faced with the problem presented in this suit and the results have varied. In a number of states which have issued decisions on tax exemptions relating to manufacturing, the words "manufacturing," "manufacturer," and "manufacture," were not defined in the statute. Among these cases are:

*Peterson Produce Co. v. Cheney,* 237 Ark 600, 374 SW2d 809 (1964), in which a tax exemption was claimed under the provisions of Ark Stat Ann § 84-3106(d) (1960 Replacement Part), which provided an exemption from property taxation for "tangible personal property used by manufacturers or processors or distributors * * * for further processing, compounding or manufacturing; * * *." The taxpayer sought exemption for incubators consisting of setting units and hatching units designed to control conditions (temperature, humidity, ventilation) essential for hatching chicken eggs. Eggs in the unit were turned hourly by electric power; after an 18-day period in the setting unit, the eggs were transferred to a hatching unit. After hatching, the chicks were removed from the unit and sold to growers. The corporate taxpayer contended that it was a processor within the contemplation of the statute. The court stated that a tax exemption must be strictly construed "and to doubt it is to deny the exemption." Manufacturing and processing are not considered two distinct operations and the use of incubators is not a "processing" step; further, a person does not "manufacture" a baby chick; an incubator merely aids and abets the natural course of hatching and is not a processing itself. An exemption was denied.

*Perdue, Inc. v. State Department of Assess. & Tax.,* 264 Md 228, 286 A2d 165 (1972), was another chicken hatchery case in which the court held that the process by which a chicken raiser took naturally fertilized eggs and placed them in an environment conducive to further development did not constitute "manufacturing" under a statute which gave authority to its city or county to pass local tax laws exempting the "raw materials of a manufacturer" from local taxation. Since the statute did not define "manufacturer," the court noted that the word must be used in its ordinary and popularly understood meaning. It used the Webster's definition set out above. The court held that: "To the average person a chicken is hatched from an egg, it is not manufactured." The court concluded that it could not extend the scope of the legislative tax exemption by giving to the language creating it a forced, strained and unnatural construction. It distinguished *Miller v. Peck,* 158 Ohio St 17, 106 NE2d 776 (1952), in which the Ohio court held mechanical incubators to be tools and implements of a manufacturer and entitled to a tax exemption. The Maryland court points out that the Ohio statute is "expansive." "This Ohio decision is of no aid to appellant since it is based on a statutory test not employed in Maryland." The exemption was denied.

*Charles River, Inc. v. State Tax Comm.,* (Mass) 372 NE2d 768 (1978), was concerned with a tax classification of "manufacturing corporations." The appellant was engaged in the large-scale production of laboratory animals and sought classification as a manufacturing corporation in order that its machinery could be exempted from local taxation. These animals were bred and raised for biomedical research and, when sold, were free from common germs and diseases. The procedures used were intricate and required great care, skill and attention. Baby mice were delivered at term by caesarean surgery into a sterile system free of bacteria. They were fed by germ-free foster mothers and, in order to maintain their usefulness for laboratory purposes, lived in a rigidly controlled but nonsterile atmosphere sustained behind physical barriers, utilizing sterile bedding and pasteurized diet, a separate air filtration system and temperature monitoring alarm systems. The court noted that in the past opinions the words "engaged in manufacturing" were regarded as words of flexible meaning

and were not to be given a narrow or restricted meaning, in order to carry out the legislative intent to encourage Massachusetts industry. However, the court concluded that: "We think it plain beyond question that, in common understanding, the breeding of animals is not manufacturing. Manufacturing normally involves the change of some substance, element, or material into something new or different. [Citation omitted.] No matter how intricately it is carried on, the production of partially uncontaminated animals by Charles River [the taxpayer] does not fit within this definition." (In a footnote, the court noted: "We leave to another day, if it comes, the question whether processes which alter the genetic structure of animals fall within this statutory concept of manufacturing.") Exemption was denied.

In *Golden Triangle Broadcasting, Inc. v. City of Pittsburgh*, 483 Pa 525, 529, 397 A2d 1147, 1152 (1979), radio and television broadcasters sued the city on the ground that broadcasters were "manufacturers" and therefore not subject to a privilege tax under a Local Tax Enabling Act which authorized the city to levy privilege taxes but denied it authority to tax "manufacturing." It was held that the word "manufacturing" must be given its ordinary and general meaning ("the application of labor or skill to material whereby the original article is changed into a new, different and useful article").

"* * * Whether or not an article is a manufactured product depends upon whether or not it has gone through substantial transformation in form, qualities and adaptability in use from the original material, so that a new article or creation has emerged. If there is merely a superficial change in the original material, without a substantial well signalized transformation in form, qualities and adaptabilities, it is not a new article or a new production."

The court could not accept the taxpayer's argument that, while using electronic equipment of complexity, it was converting news and information into a totally different form on the screens and in the loudspeakers of the receiver's television and radio apparatus. Exemption was denied.

There was a strong and interesting dissent in the *Golden Triangle* case, *supra,* at 537, in which Justice Larsen took what may be termed a "liberal" view:

"Finally, it is important to remember that the limitation placed by the legislature on City's authority to tax is intended to encourage the growth of manufacturing in this Commonwealth. The courts, in their development of standards for determining whether or not a particular enterprise is engaged in manufacturing, should be concerned with achieving that legislative objective. To that end, the standards must be flexible and the courts must be willing to adapt the standard to comport with rapid technological and scientific progress. As research and development in countless areas produces techniques and processes that may have been hitherto unheard of, we must not rigidly bind ourselves to outmoded concepts. That we cannot physically grasp or feel the product of the broadcaster's manufacturing process does not mean manufacturing is not in place. As the 'Star Trek' era is ushered into our lives, this Court must be prepared to keep its perspectives progressive and its definitions flexible, or else this Commonwealth will fail to acquire modern, technological manufacturing operations."

This is the spirit in which the present intervenor argues its case and is perhaps the inner thinking which is found in the two following cases where the pertinent words relating to "manufacturing" are not defined in the statute.

The first is *Master Hatcheries, Inc. v. Coble,* 21 NC App 256, 204 SE2d 395 (1974). Plaintiff in this case purchased machinery for use in its chicken hatchery business and sought a tax advantage provided by statute for "mill machinery or mill machinery parts and accessories to manufacturing industries and plants." The taxpayer's machinery and equipment were apparently identical with those items described in *Perdue, Inc. v. State Dept. of Assess. & Tax, supra.* The court found:

"In our modern day the poultry industry as one of our major sources of food has become a large complex industry. * * * Sophisticated machinery controls temperature and humidity and mechanically turns the incubator trays to prevent the embryo from remaining in one position. * * *"

It cited *Miller v. Peck, supra,* and concluded by holding that a commercial chicken hatchery is a manufacturing plant within the meaning of the statute. (Campbell, J., dissented, "This is a matter for the legislature and I therefore dissent.")

*Commonwealth v. Perfect Photo, Inc.,* 29 Pa Commw Ct 316, 371 A2d 580 (1977), is a related case in which a photo finisher claimed to be engaged in "manufacturing" (and therefore exempt from certain capital stock taxation) because of the intricacy of the operation, involving highly specialized machinery and equipment. The court concluded that, while the making of a photograph is not manufacturing in the popular understanding of "manufacturing," the making of prints, slides and moving picture films has drastically changed and the present-day methods and procedures utilized by the taxpayer bring the making of these items within the proper sense of the word "manufacturing." The court cites the case of *Pillsbury Mills, Inc. v. Pittsburgh School District,* 408 Pa 369, 184 A2d 236 (1962), in which the milling of flour from many types of wheat was held manufacturing, because of the court's conclusion that "present-day milling bears no relationship to the mortar and pestle operation of ancient times." The exemption was allowed.[3]

Cases in which a tax exemption was allowed include *Miller v. Peck,* 158 Ohio St 17, 106 NE 2d 776 (1952), relating to a commecial chicken hatchery; *Red Top Brewing Co. v. Bowers,* 163 Ohio St 18, 125 NE2d 188 (1955), holding that brewing was manufacturing; *Bornstein Sea Foods, Inc. v. State,* 60 Wash 169, 373 P2d 483 (1962), holding that "manufacturing" involved the filleting, packaging and freezing of fish; *Continental Coffee Co. of Washington v. State,* 62 Wash2d 289, 384 P2d 862 (1963) (roasting and blending of coffee), and

---

[3] This court has not disregarded other cases cited by counsel or found by the court which have some bearing upon the present question but which are distinguished because the words "manufacturer" or "manufacturing" were based upon a statutory definition which extended the common meaning to a degree that would not be tenable in Oregon. Even in this circumstance, the strict approach was followed in *Holloway v. State,* 262 Ala 437, 79 S2d 40 (1955), involving baby chicks; *Stone v. Sullivan,* 155 Conn 498, 227 A2d 76 (1967), relating to the purchase of sides of beef and dividing them into their constituent parts; *Commonwealth v. Babcock Lumber Co.,* . 1 Pa Commw Ct 45, 272 A2d 522 (1971), in which the kiln drying of green lumber was held not to be manufacturing.

*McDonnell & McDonnell v. State,* 62 Wash2d 553, 383 P2d 905 (1963) (involving the processing of dried split peas), based upon the *Bornstein* decision. (In the latter case, there was a dissent by Weaver, J., who believed that the majority opinion extended the doctrine of *Bornstein* to a factual situation that was not within the ambit of the statute. "The majority opinion describes the process in question. The record and exhibits, however, do not give me the impression that the process is as complicated as the opinion suggests.") *Continental Coffee Co. v. Bowers,* 174 Ohio St 435, 189 NE2d 901 (1963), held that cleaning, blending and roasting coffee beans is manufacturing; *Wilson & Coe, Inc. v. Dept. of Rev.* (Mo), 531 NW2d 752 (1976), held that conversion of hogs into marketable food for human consumption was "manufacturing" within the meaning of the statute.[4]

■　　It appears to the court that the intervenor in the present suit is as much entitled to a tax exemption as other parties to whom the exemption is readily granted under ORS 307.330 and 307.340, but that close adherence to the rules of statutory construction prohibits this court from so finding. *Oregon Oyster Co. v. Dept. of Rev.,* 7 OTR 308 (1978). The liberal construction of some statutes by judges in cases cited herein does not appear applicable under Oregon's traditions in which the separation of judicial and legislative powers is respected. The authority and responsibility of the Legislative Assembly to enact legislation is unique. The courts must not infringe on the legislative process by enlarging tax exemptions. Although there is dissent, strict construction is not obsolete. *HCSC-Laundry v. United States,* 450 US 1, 101 S Ct 836, 67 L Ed2d 1 (1981).

The court finds for the plaintiff Director of Assess-

---

[4] *State v. Marastoni,* 85 Or 37, 165 P 1177 (1917), cited by counsel herein, is an Oregon case in which the court held that the word "manufacturing" was the synonym for "make," construing a prohibition-type Oregon constitutional provision, prohibiting the manufacture or sale of intoxicating liquors within the state. It was held that a criminal sanction was proper in the case of a person who squeezed grape juice into containers and, thereafter, no act or thing being done by the defendant, the juice was allowed to remain in the containers to ferment, by natural process of nature alone, and to be used as a beverage for family use. This case is too far removed in fact and statute to be useful in the present controversy.

ment and Taxation for Lane County. The defendant's Order No. VL 80-41, dated March 5, 1980, shall be set aside and held for naught. Each party will abide its own costs.