# PACIFIC POWER & LIGHT COMPANY
*v.*
## DEPARTMENT OF REVENUE

[ 205 ]

Gerard K. Drummond and John B. DesCamp, Jr., of Rives, Bonyhadi & Drummond, Portland, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered October 10, 1977.

CARLISLE B. ROBERTS, Judge.

The plaintiff is a Maine Corporation, qualified to do business in the states of Oregon, California, Washington, Montana, Idaho and Wyoming. Its principal place of business is in Portland, Oregon. The corporation provides electric, water and steam heat service to retail customers within the State of Oregon and elsewhere and has property situated within this state which is subject to ad valorem taxation. The plaintiff is included in that category of designated utilities whose properties are annually assessed by the defend-

ant, the Oregon Department of Revenue, pursuant to ORS 308.515.

The defendant has the duty to execute the provisions of ORS 308.505 to 308.665, a statute designed for the central assessment of railroad and public utility properties (and some others) where the greater part of the property is operated as a unit, although its location may transcend county and state boundaries.

Plaintiff has appealed to this court from two orders of the Department of Revenue, Nos. A&AU-75-65 and A&AU-76-39, relating respectively to the true cash value of plaintiff's electric service properties as of January 1, 1975, and January 1, 1976. On plaintiff's motion, the two suits (No. 987, relating to the 1975-1976 tax year, and No. 1095, relating to the 1976-1977 tax year) were consolidated for trial because both suits involve common questions of law and fact and consolidation would avoid delay and unnecessary expense. No. 987 was used as the vehicle for trial, with the recognition of court and counsel that determinations made therein were equally applicable to No. 1095.

ORS 308.510 defines "property" for the purposes of ORS 308.505 to 308.665, applicable to a regulated public utility (such as the plaintiff) as follows:

"(1) 'Property,' * * * includes all property, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service * * * whether or not such activity is pursuant to any franchise, and includes but is not limited to the lands and buildings, rights of way, roadbed, water powers, vehicles, cars, rolling stock, tracks, wagons, horses, office furniture, telegraph, telephone and transmission lines, poles, wires, conduits, switchboards, machinery, appliances, appurtenances, docks, watercraft * * *, merchandise, inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all other goods or chattels."

ORS 308.555 provides that the department, for the purpose of arriving at the true cash value of the

property assessable by it, may value the entire property, both within and without the State of Oregon, as a unit. A formula (not challenged herein) is used to determine the part of the total property which is assignable to Oregon. ORS 308.565 makes provision for the allocation and apportionment of the Oregon assessed property to the several Oregon counties. All the subject property in these suits is "electric service property," and its value is affected by public utility regulation.

ORS 308.205 provides that "true cash value" of all property, whether real or personal, means the market value as of the assessment date. Methods and procedures for determining true cash value must be promulgated as rules and regulations by the Department of Revenue. In its rule, OAR 150-308.205-(A), the department has defined "market value"

> "* * * as a basis for true cash value * * * to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed."

The promulgator of the rule recognized the problems which arise for assessment purposes when there are no sales of comparable property at times and places reasonably relevant to a particular property and, also, that one of the approaches to value may not be applicable in a given situation. In part 2 of OAR 150-308.205-(A), it has provided:

> "2. Methods and Procedures for Determining True Cash Value: Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."[1]

[1]Under the canons of ethics of the national societies of property appraisers, a qualified appraiser, in his correlation, should advert to each

Following assessment of the plaintiff's electric service properties by the defendant as of the assessment date, January 1, 1975, the plaintiff filed its petition with the defendant for correction, pursuant to ORS 308.595(2), asking that the assessment of $446,670,000 be reduced by the removal of $13,857,000 "which was developed in staff treatment of Account 281, and $31,636,000, which was developed in staff treatment of Accounts 282 and 283, from the system income indicator of value." (Opinion No. A&AU-75-65, at 1.) The petition was denied in the order dated July 10, 1975, and the plaintiff has appealed to this court pursuant to ORS 308.620.

In amended complaints filed in the court on November 15, 1976, plaintiff referred to the notice of the defendant, dated May 20, 1975, made pursuant to ORS 308.595, advising the plaintiff that its Oregon electric utility property, subject to assessment by the department, had been assigned a true cash value of $446,670,000. Plaintiff recited in paragraph V of the Amended Complaint that the department purported to assign a true cash value to the utility property by using a composite weighted average of indicated system values as follows:

"(A) 'Cost of plant,' weighted at 60%;

(B) 'Capitalized income,' (including probable future operating income) weighted at 30%; and

(C) Market value of the Company's outstanding 'stock and debt,' weighted at 10%."

In paragraph VII, the Amended Complaint stated that the defendant had made the following errors in determining the true cash value of the plaintiff's Oregon electic utility property:

"(A) The Department has added to the indicated system value using the 'capitalized income method'

─────────────

of the approaches to value and, in his appraisal report, cite a reason for the omission of any of the approaches of value in a particular case; *e.g., see The Principles of Appraisal Practice and Code of Ethics,* Am Soc of Appraisers ¶¶ 6.2, 8.4 (Reprint Series # 11, July 1973); Am Inst of Real Estate Appraisers, *The Appraisal of Real Estate* 374 (5th ed 1967).

estimates made by the Department of the present value of estimated future net accruals to deferred federal income tax accounts on the Company's books, which results in overstating the indicated Oregon electric utility property value, as determined by the capitalized income method.

"(B) The Department has included, in its calculation of the Company's Oregon system value by the 'stock and debt' method, the sum of $19,044,200 which is stated to be value attributed to a portion of the deferred federal income taxes appearing on the Company's books and which results in overstating such Oregon indicated system value determined by the 'stock and debt' method.

"(C) In determining the 'stock and debt' indicator of value the Department included the sum of $18,418,300 which is equal to the 'Materials & Supplies' on the Company's books as of December 31, 1974.

"(D) As an estimate of the Company's 'probable future operating income' for the assessment year, the Department has erroneously used the figure of $116,676,400.

"(E) In computing the Company's 'income indicator' of value the Department capitalized the Company's 'probable future operating income' using the 9% rate of capitalization.

"(F) In weighting the three indicators of value, the Department assigned a 60% weight to the cost indicator, a 30% weight to the income indicator and a 10% weight to the market data indicator."

Thereafter, the court approved the defendant's written motion to file amended answers which alleged the true cash value of the property as of January 1, 1975, to be $560,067,000 and, as of January 1, 1976, to be $558,964,500. In oral argument on behalf of these motions, defendant proposed a further amendment to its amended answers, to set out the true cash value in paragraph III of case No. 987 as $570,472,000 and in paragraph III of case No. 1095 as $569,259,000. The court, based upon its interpretation of ORS 308.515 to 308.635, particularly ORS 308.620 and 308.630(2), and

ORS 305.425(3), allowed the motion and the amended answers were filed on December 1, 1976.[2]

Plaintiff's preparation for trial, involving the use of expert witnesses, had been directed toward meeting the conclusions of the department based upon the original assessment notice of May 20, 1975. However, at the trial, defendant presented new appraisals particularly prepared for the trial de novo (ORS 305.425) in which there were substantial departures from the appraisal theories originally used by the defendant. The plaintiff had rested its affirmative case on November 18, 1976. On November 19, the amended appraisals (Def Ex B and C) were presented in writing and in the oral testimony of Mr. Norman M. Arrowsmith, a witness for the defendant. The newly written appraisals were offered and received in evidence. By agreement of court and counsel, following the testimony of defendant's witness, cross-examination was deferred to allow the plaintiff's counsel and aides to study the newly compiled material (which set out conclusions of the true cash value in dollar amounts for the subject property for the tax years 1975-1976 and 1976-1977 in amounts substantially different from those values pleaded in the Defendant's Amended Answer; i.e., $569,932,000 and $566,918,000, respectively, in the new material). Trial was resumed on January 18, 1977, and written post-trial briefs were filed thereafter.

Mr. Arrowsmith, an appraiser for the Department of Revenue, was one of three witnesses presented by the defendant and the only one who testified as an appraiser. In his original appraisals of the subject properties for the two years before the court, he had

<hr>

[2]Plaintiff, in its briefs, has referred to "a presumption of validity which ordinarily attaches to the valuation" determined by a county assessor or the Department of Revenue. Pl Op Br 12; Pl Rep Br 23. The cases cited by plaintiff have been overruled by *J. R. Widmer, Inc. v. Dept. of Rev.,* 261 Or 371, 375, 494 P2d 854, 856 (1972). Plaintiff's burden of proof is established by ORS 305.427. *And see Publishers Paper Co. v. Dept. of Rev.,* 270 Or 737, 745, 530 P2d 88, 92 (1974).

followed the long-standing practice of the Department of Revenue to use three approaches to value (Tr 789), with some modifications required by his supervisors which were objected to by the plaintiff as being erroneous, as specified in pages 210 and 211. However, in the preparation for this trial de novo, he apparently was given free rein by his supervisors, subject to the admonition that he "make sure that the appraisals used in 1975 and 1976 were my best appraisal of the true cash value of the company's properties." (Tr 902.) He determined to abandon the stock and debt and the historical cost-less-depreciation approaches and relied solely upon the income indicator of value, with interesting variations. (Tr 902-905.) This was Mr. Arrowsmith's first experience in offering a single approach to value (but there is no doubt that he had given consideration to all the customary approaches). (Tr 791.) He also made clear that his method had not been approved by any person beyond his immediate supervisor and that no policy change had been considered or approved by the Department of Revenue, acting officially, in consequence of his innovations. (Tr 826.)

Mr. Arrowsmith described his last and recommended appraisal as being "a straight income approach to appraisal based on capitalization of the entire cash flow expected to be derived from operation of the plant subject to appraisal during the remaining life of that plant." The approach is fully detailed in the "Supplementary Appraisal 'D' " in Defendant's Exhibit B, 32-39a, for the 1975-1976 tax year, and, for the tax year 1976-1977, the material is duplicated substantially in Defendant's Exhibit C, 28-35a.[3] In

---

[3]The court's conclusions on numerous disputed points in this extremely technical field, leading to its final decisions, can best be understood by duplicating the trial judge's study of the official transcript of 1245 pages, of hundreds of pages of exhibits introduced by counsel, and of the cases cited by counsel and the court. Recognizing that the printed decision will be lengthy in any event, that it will be of interest only to a relatively small group of individuals and that they are trained to use the materials

consequence of Mr. Arrowsmith's presentation of Supplementary Appraisal "D," upon which the defendant elected solely to rely in proof of its contentions (Tr 811-820), plaintiff listed 12 errors found by it in the department's Supplementary Appraisal "D," in addition to those set out on pages 210 and 211.

The court will consider each of the new allegations of error (listed in Plaintiff's Opening Brief, ii, 28-54) in numerical order, and then give consideration to the plaintiff's list of errors in its Amended Complaint.

■ 1. *Valuation Technique.* The plaintiff complains that the department used only the income approach to valuation. (Def Ex B, 32 et seq.; Def Ex C, 28 et seq.) The court takes note that the department's rule, OAR 150-308.205-(A), allows any one of the three approaches to value, or all of them, or a combination of approaches, in estimating true cash value. However, this rule does not permit arbitrary or capricious action and its justification is measured for the court by the logic of the appraiser in making an important subjective judgment.

Mr. Arrowsmith, the appraiser for the defendant, explained his reliance upon the income approach and his reasons for discarding the stock and debt indicator and the cost approach. (Tr 902-903.)

"* * * Basically, I've never believed that the stock and debt indicator of value is a valid indicator of value. * * * [T]he stock and debt indicators of value reflect more of market attitude in the securities market than they do the value of underlying property and, two, the use of the stock and debt indicator which I believe in times of the ebullience of the market, if you will, tend to overstate the value of the underlying property or in periods of pessimism tend to understate the value of the property. Since the stock and debt indicator of value is available in only a relative few of the utilities which we

described herein and have relatively easy access thereto, the court has sought to prevent a drain on its printing budget by utilizing citations to the material in lieu of long quotations which might otherwise be printed.

assess, the use of that indicator will tend to distort the value, high or low, for those companies * * *.

"The — looking at the cost indicators of value, generally in the literature it is stated that cost in itself is not value. At one point in time cost may approach value quite closely and that is at the time of original acquisition of the property but the farther away we get from that the less certain it is as an indicator of value, particularly historical cost. * * * [C]ost as such is a useful tool primarily in determining the prospective benefits to be derived from the property in the future but as an indicator of value it could serve as a reference plane but it is really not value in itself. And based on this, since the department had been leaning very heavily on cost in the past, and all appraisals were very definitely cost oriented, I feel that the use of the stock and debt indicator of value and the cost indicator of value have tended to be, at least in recent past, conservative compared to actual market value so I concluded that I would prefer not to use the historical cost depreciated indicator of value."

Testimony shows that this use of a single approach represented a departure from the defendant's long-standing practice of using the cost, income, and stock and debt methods as a means of checking the accuracy of the results produced by each of the methods. The testimony showed that the tripartite approach is used by Washington, Idaho, Montana and California and was used in 1975 and 1976 by the department for all valuations except those of the plaintiff.

██ In the well-accepted text of the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (5th ed 1967), it is stated at 60-61:

"* * * The three approaches—cost, income, and market data—are based on these three facets of value.

"In the majority of his assignments, the appraiser utilizes all three approaches. Occasionally he may believe the value indication from one approach will be more significant than from the other two; yet he will use all three as a check against each other, and to test his own judgment. Obviously there are appraisal problems in which they all cannot be applied. For example, the

appraiser cannot use the cost approach for a value indication of vacant land, or the market data approach for specialized property such as a municipal garden, and only rarely the income approach for an owner-occupied home. The use of all three approaches is pertinent to the solution of most appraisal problems; their application is well established in appraisal technique and held to be part of the fundamental procedure."

Again, at 373-374:

"The correlation of the indicated value estimates made in the three approaches is the last major step in the appraisal process. Correlation quite literally means bringing together the facts and fitting them together to conform to cause and effect relationships. It is the bringing of the elements into balance with each other to constitute a unified and coherent whole.

"The process of correlation is continuous from the beginning to the end of the entire appraisal. It is a guiding principle in each major step: definition of the problem, preliminary survey, the data program, the cost approach, the income approach, and the market data approach. In each of these major steps the data must be integrated to make a convincing support for the conclusion formed. In the end, the indicated value estimates are correlated to reach the final estimate of value.

"The scope of the final correlation is dependent upon the reliability of the indicated value estimate, the complexity of the appraisal problem, the adequacy or inadequacy of pertinent data, and the care with which the various processing procedures have been executed. The application of each of the three approaches results in an indicated value of the property. * * *

"Correlation in the appraisal process also means a weighing of the approaches in relation to their importance or their probable influence on the reactions of typical users and investors in the market. * * *
"* * * * *

"The principal function of the appraiser, in the correlation of the data into a final estimate of value, is to give sound reasons for the relative weight he has assigned to the value conclusion derived by each approach. * * *"

*See also* the publication of the International Association of Assessing Officers, *Assessing and the Appraisal Process* (5th ed 1974), 18-23; and *Encyclopedia of Real Estate Appraising,* ch 7 (Friedman ed, rev & enlarged ed 1968).

 As stated in Friedman ed, *supra,* 126:

> "The use of accepted appraisal methods and techniques does not in itself produce a sound value estimate. It must be combined with *good judgment* on the part of the appraiser, as well as experience in gathering needed information and making thorough analyses and valid interpretations of relevant data."

Mr. Arrowsmith worked zealously and honestly. However, his experience was substantially less than that of qualified witnesses who opposed his views. (He has a degree in electrical engineering, Tr 18; he has no degree in any subjects relating to appraisal of public utilities, Tr 18; he had no prior experience as an appraiser until employed six years ago by the defendant, and he has never been certified as an appraiser except by the State of Oregon. He took no examination to obtain such certification. Tr 19.)

 Where data for use of the three approaches to value are available, the overwhelming weight of authority on the part of writers and qualified experts is that each of the three approaches to value should be utilized. The cost approach, particularly, should not be overlooked in this case. As stated by Dr. Alfred A. Ring on the witness stand (Tr 1176-1177):

> "* * * Now logic would dictate that where a company under strict regulation is limited to earnings based on depreciated book cost that the true cash value, no matter what approach to value is applied, cannot possibly exceed the depreciated cost on which the company's earnings are limited on a fair rate of return basis. In fact, in all instances known to me, historical or original cost less depreciation has set the ceiling of value for regulated public utility companies. True cash value is always less than historical or book cost where the

company's allowed rate of earnings is less than the market rate of cost of capital on the date of the appraisal. * * *"

Dr. Alfred A. Ring, an independent appraiser specializing in public utilities (Tr 537), is an economic consultant, lecturer, textbook writer, and expert witness before state and federal courts in matters related to ad valorem taxation, with 40 years of experience. (Tr 537-540.)

■ The court agrees with the plaintiff that all three approaches to value should have been used in these cases and that the witness for the defendant, having adverted to each approach, was in error in not utilizing all of them since each would contribute to the validity of the final result. The question of the weight to be given to each of the approaches, an essential aspect of the correlation of data, is discussed below, at 237 et seq.

2. *Annuity Method of Capitalization — Treatment of Depreciation.* Mr. Arrowsmith, utilizing the income approach solely, was of necessity required to develop a capitalization rate and take into account the hypothetical purchaser's recovery of his capital which was invested in depreciable property.

Mr. Arrowsmith chose to use the annuity method of capitalization, a method in which (a) there is no requirement that depreciation be reinvested in order to keep the income stream level, and (b) the depreciation component or return of invested capital is assumed to be immediately reinvested, at the assumed rate of return of the original investment, in a "sinking fund," which may be a bank account or similar or other types of property. *See* Def Ex B, 32, 35a-38 (note "sinking fund factor" and ratio on 37); Pl Ex 29, 14-16.

Both Mr. John C. Goodman[4] and Dr. Ring, as

---

[4] *See* Tr 457-461 for the qualifications as an expert appraiser of public utility property values of Mr. John C. Goodman, Vice-president of American Appraisal Company, Milwaukee, Wisconsin, and manager of its Public Utilities Division.

witnesses for plaintiff, testified that this method is only appropriate for use when valuing a property which produces a fixed or guaranteed stream of income and in which depreciation reinvestment is not required to keep the income stream level. (Tr 1097, 1173.) In Plaintiff's Exhibit 29, at 16, there is a summary of Mr. Goodman's testimony which follows:

> "It is clear that Pacific's plant is not subject to this valuation procedure [as presented by Mr. Arrowsmith in Supplementary Appraisal 'D']. Pacific's income is not fixed or guaranteed. A more important reason for the inapplicability of this procedure is found in the DOR's [Department of Revenue's] own assumption that the operating income is maintained level by the reinvestment of depreciation expense. Without this reinvestment the rate base would decline and therefore Pacific's net operating income would also decline.

> "To then assume, as the DOR does, that the depreciation would also be invested in additional plant or an income bearing account which would also earn is double counting. The DOR uses the depreciation to maintain the net operating income level and then presumes to use it again. This cannot be possible and it is obvious that the annuity method of capitalization cannot apply to the valuation of Pacific's property for ad valorem tax purposes."

Other arguments which impressed the court are recapitulated in the Plaintiff's Opening Brief, 29-32.

In its use of the sinking fund, the defendant ascribed earnings at 9 percent and 9.5 percent, respectively, for the years 1975 and 1976. (Tr 682; Def Ex B, 37; Def Ex C, 33.) Strong grounds for questioning these amounts are set out in Plaintiff's Opening Brief, 32-35, which carry conviction to the court.

The court agrees with plaintiff that the defendant's annuity method of capitalization and the rates used for sinking fund purposes were in error in these suits and should not be utilized in determining the property values for the subject property in the subject years. (*See* Pl Rep Br 2-3.)

3. *Depreciation — Flow-Through Accounting.* Plaintiff contends that the department consistently ignored the accounting methods used by Pacific, methods which were required by the regulatory process under the regulations of the Federal Power Commission and of the Oregon Public Utility Commissioner, and asserts that steps taken by the defendant consistently produced a higher valuation than that which was justified. As an example, Supplementary Appraisal "D" assumes Pacific's immediate "flow through" of investment tax credits. (Def Ex B, 32; Def Ex C, 28.)

> "* * * This assumption, which has the effect of artificially inflating Pacific's Net Utility Operating Income, is made in spite of the fact that Department personnel know Pacific is subject to regulation by the Oregon Public Utility Commissioner and the Federal Power Commission, and that these regulatory bodies have approved Pacific's use of deferred tax accounting for certain items." (Pl Op Brief, 36. *See also* Tr 339, 1053.)

██ ██ It appears clear to the court that any appraiser in these cases must constantly hold in mind that the subject property is the property owned or used by a regulated utility and that this fact permeates every aspect of the procedure which attempts to develop an ad valorem value for the property within the requirements of ORS 308.505 to 308.665. Regulatory requirements are legal conditions which must be fully recognized by potential sellers and buyers and, consequently, by appraisers, wherever they have an impact on value. *See Martindale et al v. Dept. of Rev.,* 5 OTR 148 (1972); *Nashville Housing Authority v. Cohen,* 541 SW2d 947 (Tenn 1976). *And see* Steadman, *Valuation for Tax and Regulatory Purposes,* Nat'l Tax Ass'n, 65th Annual Conf, 1972 Proceedings, 372 (1973).

Indeed, the court finds that each of the witnesses testifying in these suits was highly conscious of this rule.

The court is not able to lay down a hard and fast rule that every aspect of regulatory accounting must be followed by the state in its property appraisal practices. However, in any instance in which a disregard of the required accounting procedures results in an addition to the appraiser's estimate of value which could not be realized by the potential seller because of regulatory limitations, the appraiser must be deemed to be in error and the appraisal, in this regard, is incorrect and unacceptable.

(Further consideration of flow-through accounting will be given below in the discussion of the department's treatment of deferred taxes.)

4. *Performance Ratio Used to Project Income.* In the use of the income approach for purposes of valuation of property, the expert appraiser hypothesizes that the thing actually purchased is the buyer's expectation of a flow of future income which will give him (a) net proceeds after expenses to recover the capital which he has invested and which will be lost through depreciation and (b) net proceeds from which he can obtain a return on his total investment at an income rate acceptable in the market. The income approach is thus described in the American Institute of Real Estate Appraisers, *Appraisal Terminology and Handbook* (5th ed 1967), 105:

> "*Income Approach*—An appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income. The capital amount, called the capitalized value, is, in effect, the sum of the anticipated annual rents less the loss of interest until the time of collection. The reliability of this technique is dependent upon four conditions: (a) the reasonableness of the estimate of the anticipated net annual incomes; (b) the duration of the net annual income, usually the economic life of the building; (c) the capitalization (discount rate); and (d) the method of conversion (income to capital)."

The income approach requires substantial amounts of particularized, verified data. Gross errors

[ 221 ]

can result if such data are not available. *Feves v. Dept. of Revenue,* 4 OTR 302 (1971); *Nepom v. Dept. of Revenue,* 4 OTR 531 (1971). A history of past income, covering several years, is essential unless comparable economic rents in a well-defined market are available. *Shields v. Dept. of Rev.,* 266 Or 461, 464-465, 513 P2d 784, 786 (1973); *Medical Bldg. Land Co. et al v. Dept. of Rev.,* 7 OTR 119 (1977).[5]

Plaintiff contends that where a utility is under regulation by both state and federal agencies, trended past income provides the best, if not the only credible guide to future income. (Tr 1162.) Based on this conclusion, plaintiff argues that the easiest and most accurate means of projecting Pacific's income for the assessment year would be by means of the "least squares" method, which produces a trend line extending into the future. (Tr 554-556; Pl Ex 16.)

Dr. Ring testified that a qualified appraiser, dealing with a new property, lacking any history of income, could forecast income for a brand new prop-

---

[5]Experts continue to vary on what is an optimum income history for use in the income approach to value. One, highly experienced in the appraisal of public utilities for ad valorem assessments, has written:

"It is well accepted that the income approach is based upon the present worth of future benefits (PWFB). This means such future benefits must be discounted to estimate their worth today. Some utility companies continue to make a presentation that analyzes the past five years' income.

"An appraiser who observes a normal rate of growth and increased income immediately will realize that, if current income is more than previous income, future income probably will be more than current income. This calls for a projection of potential income. A projection of five years into the future would be as extreme as the act of limiting ourselves to the past five years. I recommend using the reconstructed net utility operating income for (1) the past two years; (2) the present year; and (3) a projection (based on the immediate past rate of growth) for two years into the future. Depending upon the discount rate used to determine PWFB, such a five year average could essentially be the same as the current year's income. This exercise should be executed, however, since our economy and the relative earning power of any one company are subject to fluctuations which could be reflected." McSpaden, *Appraisal of Public Utilities for Ad Valorem Assessment,* 8 Assessors J 66, 74 (Jan 1974) (published by the Int'l Ass'n of Assessing Officers, Chicago, Ill.)

erty by going to similar properties, studying the income history and then developing a "performance ratio." The court agrees. *See Medical Bldg. Land Co., supra,* at 126-127.

In spite of the long history of Pacific, Mr. Arrowsmith chose to calculate a "performance ratio" by dividing Pacific's net utility operating income (as adjusted by him in several respects, each of which was contested by the plaintiff) by Pacific's "average earning plant" as calculated by the department. This performance ratio was then applied to the department's estimate of Pacific's average earning plant (including construction work in progress) during this assessment year. (Def Ex B, 34; Def Ex C, 30.)

The testimony shows that the performance ratio, as calculated by Mr. Arrowsmith, predicted a probable future net operating income for 1975 and 1976 which was 33 percent and 27 percent, respectively, higher than the plaintiff's actual or estimated net utility operating income for those years. (Pl Ex 12, 17; Tr 1163-1164.) In fact, using a five-year period (data within the possession of the defendant), Mr. Arrowsmith's estimate has exceeded actual net operating income by an average of more than 19 percent. (Tr 1163.)

The court holds that this choice of method was in error, inasmuch as it gave inaccurate results in a situation where data were available which ordinarily would have been used by the skilled appraiser and which provided a more logical result and, in the court's opinion, a more accurate result.

5. *Construction Work in Progress (CWIP).* ORS 308.510(1) requires the defendant to value all of the plaintiff's construction work in progress (CWIP) as of January 1 of the assessment year. "Construction work in progress" and "completed construction not classified — electric" are among the classifications of accounts established by the Federal Power Commission. (*See* Def Ex K, 406.) Plant expenditures under construction

are accumulated in the CWIP account until the plant is put in service. The placing of CWIP into service is significant to the utility's income production and even more significant with respect to the formal procedure necessary to obtain from the PUC an order recognizing the new plant in service as a part of the utility's rate base. Since we are here dealing with ad valorem taxation, it is a duty of the defendant to establish a true cash value for the tax year of construction work in progress as of the assessment date, even though the new construction is incomplete.

In the original appraisal made by the department's staff for assessment purposes, the pertinent CWIP was valued by means of the cost approach only. When Mr. Arrowsmith chose to rely solely on the income indicator, he made the assumption that all CWIP would become "Plant in Service" (as that term is used by the regulatory bodies) as of January 1 of the assessment year and, further, that such property would begin generating revenues and depreciation cash flow as of that date.

The testimony is convincing that Mr. Arrowsmith's assumptions were incorrect. (*See* Pl Ex 13 and attachment 1 to Ex 29, and Tr 312-315 and 1101.) It seems clear that no more than 65 percent of the CWIP on the plaintiff's books as of January 1 is actually closed to Plant in Service in any given year and little if any is closed at January 1 or immediately thereafter (Tr 312). The remaining 35 percent is carried over to succeeding years. And then, most importantly, even when CWIP is closed to the Plant in Service account, it does not become a part of the plaintiff's rate base and is not able to generate income at plaintiff's allowed regulated rate of return until a rate proceeding has been held in each of the six states in which Pacific operates. The preponderance of the testimony shows that the rate-making procedure takes at least a year and there is always a substantial lag in obtaining an actual return of income for the reason that inflation or other factors soon dilute the value of the effective rate.

■ Mr. Arrowsmith's conclusions serve incorrectly to inflate plaintiff's valuation. The testimony and common knowledge lead to the conclusion that CWIP should be treated very conservatively by the appraiser from the value standpoint, particularly in this day when great delays may be caused by each of the regulatory bodies involved in land use planning, conservation, and public health and safety, postponing or foreclosing the actual use of a huge investment. *See Portland Gen. Elec. Co. v. Dept. of Rev.,* 7 OTR 33 (1977); *Reorganized Church LDS v. Dept. of Rev.,* 6 OTR 510 (1976).

■ Construction work in progress should be treated by the appraiser as an accumulation of engineering, labor, and building materials under the cost basis. All these, of course, are reflected in the stock and debt approach without adjustment.

The use of CWIP in the income approach challenges an experienced, expert appraiser's best knowledge and judgment. Such property logically can be expected to produce future income, an amount which must be determined by the appraiser. But there is a time element involved: when will the knowledgeable buyer first expect income actually to be received? The appraiser must be able to distinquish between imminence and immediacy, and offer testimony thereon which carries conviction.

■ Ordinarily, a "property tax appraiser"[6] whose particular assignment was to appraise a commercial building under construction, as of a specific assessment date, would omit the use of the income approach, and with good reason. When the statute requires the

---

[6] In Oregon, the government's appraiser for property tax purposes must meet all the challenges of any expert appraiser when his work is contested in court. However, he does play a role different from the typical fee appraiser in Oregon in that the government's appraiser is involved in mass appraisals which are open to question by experts, and that he has the opportunity to correct his appraisals annually or upon the basis of proof submitted on an appeal. *See Encyclopedia of Real Estate Appraising,* ch 47, 1007-1010 (Friedman ed, rev & enlarged ed 1968).

consideration of CWIP, as in these suits, he must observe the conditions set out by the court in *Mt. Bachelor v. Dept. of Rev.,* 273 Or 86, 539 P2d 653 (1975): past earning performance, rate of change of past income, and a determination of "the flow of income that would be anticipated by *reasonable, knowledgeable* buyers and sellers *as of the assessment* date. * * *" (*Mt. Bachelor, supra,* 92; emphasis supplied.) (*See also* Pl Rep Br, 34-38.)

 The testimony of plaintiff's witnesses herein is accepted as outlining the proper procedure to be followed on this point. A conservative position will be taken by knowledgeable buyers.[7]

6. *Materials and Supplies.* Plaintiff contends that the department, in its calculation of plaintiff's performance ratio for 1975, excluded from its "average earning plant" figure the amount of the plaintiff's materials and supplies, "even though the Department states that Materials & Supplies are included in this figure. * * *" (*See* Pl Op Br 40.) Materials and supplies are normally included in Pacific's rate base and generate revenues for the company. (Tr 1102.) Plaintiff's conclusion is that, by failing to include this item in its calculation of Pacific's performance ratio, the department decreased the denominator of the fraction "net utility operating income" divided by "average plant in service," and thereby inflated the

---

[7]Defendant's Ans Br 20 suggests "the alternative determination of value for all the properties that are to be appraised in this proceeding is to make a value estimate based on the income from the rate base and other earning properties *and to add, at cost, the CWIP.* * * *" (Emphasis supplied.) The court has no objection to fractional appraisals in the proper situation and in the narrowest sense of that term (*see* definition, Am Inst of Real Estate Appraisers, *Appraisal Terminology and Handbook* 86 (5th ed 1967), and *The Principles of Appraisal Practice and Code of Ethics, supra* n1, ¶ 6.3), but must rule out testimony which heedlessly merges aspects of the three accepted approaches to value into an unidentifiable combination. Each approach (with its established variations) must be given its due consideration and the weight attributable to each must be resolved in the correlation. This is necessary because none of the approaches is wholly reliable, standing alone, and its usefulness is decreased pro tanto by each departure from the norm.

resulting performance ratio, resulting in an inflated estimate of the plaintiff's probable future operating income for the assessment year.

Defendant, in its Answering Brief, 3-4, admits this error and supplies an amended computation on an unnumbered page immediately following page 45 of the Answering Brief, labeled "Computation No. 1, *Correction of 1975 Appraisal D to Properly Reflect Materials & Supplies.*" Materials and supplies, as an income-generating item, shall be included in the "average earning plant" in the amended approach to income which will be necessitated by this decision.

7. *Rate Increases.* An error of defendant alleged by the plaintiff, important to the decision of these suits, was the defendant's inclusion in the plaintiff's cash flow of increments for future rate increases, to be capitalized to determine the true cash value of the subject property under the income approach. As pointed out by the plaintiff (Pl Op Br, 41 et seq.), such future rate increases fall into two categories: (a) rate increases already granted and (b) pending rate increases.

The appraiser is required to establish a true cash value as of January 1 of the assessment year. Obviously, the data upon which he relies must be that derived from the preceding year or years. As of the assessment date, in the case of a public utility, the status of future rate increases may be classified in various stages, ranging from a mere concept in the collective minds of plaintiff's management to authorized increases ordered by the regulating authorities in the last two years, one year or less.

On the basis of the testimony, and recognizing that each tax year must stand upon its own feet, it is this court's conclusion that only rate increases already granted prior to the assessment date can properly be considered by the appraiser as affecting the cash flow to be capitalized. Each of the rate increases already granted must be carefully analyzed

[ 227 ]

(as they would be by the informed potential purchaser of the property). The appraiser must give consideration not only to the anticipated revenue but also to the anticipated expenses (including both federal and state income taxes), which the defendant apparently failed to do in the present suits (except as to federal income taxes). The effect of "regulatory lag" must be carefully studied to ascertain its effect on the actual operating income of the utility. In the present suits, it appears that the plaintiff has been able to achieve net utility operating income of approximately 34 percent of operating revenues, whereas the department has estimated a return of 52 percent. The assessor's appraiser should place a ceiling upon his speculations with respect to rate increases already granted, making certain that he does not exceed the reality of the plaintiff's experience, unless he is able to prove an exception by cogent evidence.

8. *Reversionary Value of Plant in Service.* Plaintiff's Opening Brief 44, states the problem:

"Items of depreciable property are commonly assigned a salvage value (typically the resale value less cost of removal) which represents the value of that item to the owner after it has been fully depreciated. In its calculations of Pacific's value, the Department included the present worth of what it referred to as the 'residual value' (apparently the salvage value) of Pacific's utility plant. Mr. Arrowsmith stated:

" 'The residual value at the end of the remaining life is the value of land included in plant in service, property held for future use, which is land, and the amount of land in construction work in progress, which was an estimated number. The salvage value of plant other than land is estimated to be zero with any salvage to be realized offset by cost of salvage. Tr. 726, Exhibit B, p. 37, Exhibit C, p. 33.'

Mr. Arrowsmith apparently believes that the cost of removal for a worn out or obsolete item of plant is equal to the amount for which this item can be sold as salvage. This assumption is totally erroneous. In fact, Pacific has for some time experienced a negative salvage value for its retired plant; that is, the cost of removing such plant

[ 228 ]

has substantially exceeded its salvage value. This is primarily due to the low book cost of old plant items and the high current costs of labor associated with the removal of such plant. Hoffmann, Tr. 1063."

Mr. Karl Hoffmann, treasurer of the plaintiff, an officer responsible for the property tax, federal income tax, and other financial accounting departments of the plaintiff (Tr 295-296), provided the only testimony of the plaintiff on this point (Tr 1063-1064), as follows:

"Q Now Mr. Arrowsmith assumed, I believe, zero salvage in his assumptions, did he not?

"A [Mr. Hoffmann] That's — yes, that's correct.

"Q And what is the company's experience with respect to salvage?

"A Well, we have to be evermore aware of the negative salvage problem.

"Q Would you explain what negative salvage is?

"A Negative salvage is the cost of removing the — these steam plant facilities. Let's assume that you would be able to sell some of the machinery in the steam plant. You would have some severe environmental restrictions. You would have to shape the — the ground to its prior form and remove the buildings and this, of course, is a — it's very expensive. So you are now accruing within your depreciation rates costs to cover this kind of removal expense 33 years from now.

"Q In other words, is what you said that the cost of removal exceeds the salvage?

"A That's correct.

"Q And are your depreciation rates presently designed to assume negative salvage?

"A Yes.

"Q And is it an error to assume zero salvage?

"A Yes, it would be. Certainly not be realistic.

"Q Did anybody from the Department of Revenue discuss with you your salvage assumptions?

"A No.

"Q Would you have failed to disclose the fact that you were employing negative salvage if they'd asked?

"A Certainly not.

[ 229 ]

"Q Would you expect in the future to achieve a situation of zero salvage or would the negative salvage increase?

"A I — I couldn't foresee this. I —

"Q Couldn't foresee what?

"A That we ever be in a zero — that we would ever have zero salvage. There'd always be a cost of removal. The cost of removal would exceed the salvage."

Defendant has called attention to plaintiff's annual reports to the federal Power Commission for the years 1971 through 1975 (all being public records in the office of the OPUC; the 1975 report was received in this suit as Defendant's Exhibit K). On page 408 of each report, there is a statement of plaintiff's salvage experience for each of the years mentioned. Defendant has copied into page 33 of its Answering Brief the experience for the years 1973, 1974 and 1975, showing a plus net salvage of 4.2 percent, 7.5 percent, and 3 percent, respectively, for these three years.

These records were not adverted to by Mr. Hoffmann, who spoke in generalizations, but they appear to the court to be better evidence than the generalities and, accordingly, the defendant's method of handling salvage value for the subject years is approved; *i.e.,* the salvage value of plant other than land is estimated to be zero with any salvage realized to be offset by cost of salvage.

9. *Defendant's Treatment of Deferred Taxes.* Plaintiff cites as a principal error Mr. Arrowsmith's use and treatment of "deferred taxes." After determining a system value for the plaintiff's subject property, he proceeded to derive an additional value for plant "built with deferred taxes," as a part of his income approach. (Def Ex B, 39a; Def Ex C, 35-35a.)

This is an extremely important and technical issue in the present suits. Useful background for an understanding thereof can be obtained by reading *Appalachian Power Company v. Federal Power Commission,* 328 F2d 237, 241-243 (4th Cir 1964), *cert denied,* 379

US 829, 85 S Ct 59, 13 L Ed2d 38 (1964), and the testimony of Mr. Robert J. Lipsiea. (Tr 275-288.) The court accepts plaintiff's argument found in its Opening Brief, 44-47.

 Mr. Arrowsmith's treatment of the deferred taxes was in compliance with an order of his supervisor, Victor N. Bredehoeft, based upon a study by Mr. Bredehoeft, set out in Plaintiff's Exhibit 6, amended by Plaintiff's Exhibit 7. The study does not carry conviction to the court. This is an instance where, for purposes of valuation of a public utility property, the requirements of ad valorem taxation must be distinguished from valuation-for-rate-regulation purposes.[8] The regulated treatment of "deferred taxes," arising from the allowable federal income tax treatment under IRC (1954), § 167 and former § 168, should be replaced, using instead the treatment ordinarily given to income taxes where these are necessarily involved in the approaches to the valuation of property for ad valorem taxation. Any values growing out of "deferred taxes" for property tax purposes will be reflected in the cost approach (HCLD) and in the stock and debt approach. They are a deductible expense as reported in the income approach.

10. *Income to be Capitalized.* In Plaintiff's Opening Brief, 47-50, the defendant is charged with numerous errors in determining the amount of income to be capitalized under the income approach; *i.e.,* the use of

---

[8]Plaintiff argues that, since its accounting system is mandated by the Federal Power Commission for regulatory purposes, "the [defendant's] appraiser is bound to accept such accounting system and methods; he cannot alter them to suit his own purposes. * * *" (Pl Op Br 21.) The court disagrees. It is true that the state's appraiser must recognize the limitations on the plaintiff's income potential by reason of federal and state regulatory agencies, recognizable in the marketplace. On the other hand, in determining the utility's income stream to be capitalized for the income approach, "the appraiser must consider whether or not the proper income stream is being considered, and, * * * whether or not the expenses are appropriate. Consequently, he should reconstruct any income and expense statements submitted to him" as may be necessary under accepted ad valorem assessment principles. McSpaden, *supra* n5, 70.

the annuity method of capitalization, incorrect computation of depreciation, "manipulating" the accounting methods which the plaintiff is by law required to follow, the use of a performance ratio to project income, imputing income to CWIP, and overestimating the effects of future rate increases. "All these errors combine to produce an income prediction which is grossly in excess of the income actually earned by Pacific in each of the assessment years. Exhibits 12 and 17." (Pl Op Br 47.) The court's views as to these items follow those of the plaintiff, as has been set out above.

On page 48 of the Plaintiff's Opening Brief, the plaintiff attacks Mr. Arrowsmith's admission that he did not capitalize the income which he expected the plaintiff to earn during the assessment year in question but, instead, capitalized the income to be earned "over the remaining life of the property." (Tr 33, 857.) Plaintiff's argument continues (Pl Op Br 48):

"This statement is nonsense. If we accept the Department's assumption that all depreciation dollars are reinvested in plant, it is obvious that the income to be derived from the existing plant, over its remaining life, is substantially greater than the Department's 'Total Income to Capitalize' of $157,529,700.

"It is equally obvious that the Department's figure of $157,529,700 does not represent the $88,031,000 actually earned by Pacific during the 1975 assessment year, nor does it represent what the Department has referred to as 'cash flow' (the sum of $88,031,000 plus depreciation of $32,358,000 or $120,389,000).

"In other words, the 'income' capitalized by the Department is an imaginary amount, totally unrelated to Pacific's actual earnings during the assessment year. * * *"

 "In using the income approach, the appraiser is concerned with the present worth of the future benefits of a property. This is generally measured by the net income *which a fully informed person is warranted in assuming* the property will produce during its remaining useful life." *The Appraisal of*

*Real Estate, supra,* 65. (Emphasis supplied.) In applying this standard rule, the words "fully informed" and "warranted," in this paragraph, must be given their usual meaning. The appraiser's own judgment is on trial here. Certainly, appraisers should avoid the casual use of speculative future income. In the case of property taxation, with the imposition of property taxes every year, there may be some temptation for a taxing agency's appraiser to give consideration to speculative influences because, if they are out of line, the matter may be quickly corrected. The temptation should be avoided. The appraiser must place himself in the position of a knowledgeable buyer who is investing his resources and obligating himself to repay money loaned him for the purpose of purchasing the property. The reasonable, prudent person, as purchaser, will strongly discount future speculative income for purposes of capitalization. (The court recognizes that "speculative" is an "accordion word.")

 It was the duty of the defendant's appraiser to test his results for the reasonableness of what he had done. Apparently, Mr. Arrowsmith failed to do this in the present instance. An acceptable appraisal would not have varied so grossly from the plaintiff's actual earnings in the 1975 assessment year.

 11. *Rate of Capitalization.* As stated in Friedman ed, *supra,* 41:

> "The capitalization rate to be applied to net income in estimating value is the rate selected by the appraiser as representing a fair return on the particular investment at the particular time, considering the risk involved. It is the rate *currently* required to attract capital to the particular type of investment. In arriving at the capitalization rate, the appraiser must consider the current competition in the investment field. Such competition may be found in stock and bond investments, business partnerships, supply and demand for competing real estate, and availability and cost of requisite mortgage financing." (Emphasis supplied.)

*The Appraisal of Real Estate, supra,* 65, states:

"In using the income approach, the appraiser is concerned with the present worth of the future benefits of a property. This is generally measured by the net income which a fully informed person is warranted in assuming the property will produce during its remaining useful life.

"After comparison with investments of similar type and class, this net income is capitalized to an estimate of value.

"*Selecting the capitalization rate is one of the most important steps in the income approach.* A variation of only one-half of one percent can make a difference of many thousands of dollars in the capitalized value of the income. For example, the difference between an annual income of $27,500 capitalized at 5% and at 5½% is $50,000." (Emphasis supplied.)

*See also* International Association of Assessing Officers, *Assessing and the Appraisal Process, supra,* 79, 88.

██ ██ In these suits, the department's appraiser was not responsible for establishing the capitalization rates. This responsibility was taken by his supervisor. They were determined to be 9.0 percent for 1975 and 9.5 percent for 1976, the rates being selected from studies prepared by an economist employed by the defendant since 1968 but whose studies, under direction of the supervisor, were directed to a determination *of a moving five-year average of annual capitalization rates* published with respect to other public utility companies. Such an average inevitably results in the minimizing of the capitalization rate and the maximizing of income, producing an inflated valuation. It results in a capitalization rate which is always lower than the actual capitalization rate for the assessment year. As the defendant admitted in its Exhibit E, 14: "[I]t should be kept in mind that the so-called current cost of money is the target * * *." As the plaintiff has concluded in its Opening Brief, 54:

"If the Department had correctly employed Mr. Fisher's [its Administrator's] band of investment

method, it should have developed cap rates of 13.18% and 12.43% respectively for the years 1975 and 1976. [Plaintiff's] Exhibit 25."

However, as applied to these particular suits, the court is in agreement with the Plaintiff that "the most appropriate cap rates would be not less than the rates of 13.13% for 1974 and 12.29% for 1975. * * *" (Pl Op Br, 52.)

Defendant, in its Answering Brief, 38 et seq., argues that "it is the long term view that the Department takes in selecting cap rates. (Bredehoeft Tr 190, 192.) It is the Department's view that the statutory requirement of value as of January 1 at 1 a.m., contemplates a value consistent with this long term investors view rather than a spot, speculators' or traders' view of value. * * *" This is in justification, presumably, of its use of a five-year moving average. However, no authority is cited for its stand. It appears to be contrary to the established treatises, and no demonstrable experience has been adduced to support it. It would appear a theory better fitted to the requirements of an overworked appraisal staff than to the reality of the market. To the court, there appears to be no justification for the department's rationale; *i.e.,* that the department has historically followed a practice of changing capitalization rates slowly to reflect long-term changes in costs of capital, and that the interest rates that existed in 1974 and 1975 were not typical. (Tr 967-976.)

12. *The Concept of "Value to the Ratepayer."* Plaintiff's Opening Brief 54, states:

"The Department appraisals introduce a new concept of value. The essence of this concept is that, although a portion of Pacific's plant is non-earning and therefore has no value to Pacific under the Income approach, this plant has value to other persons and such value is properly taxable to Pacific. * * *"

Reference was made to Mr. Arrowsmith's testimony, Tr 723 and 730, and Defendant's Exhibit B, 35 and 39a, and Exhibit C, 31 and 35.

[ 235 ]

ORS 308.515(1) specifies that the Department of Revenue shall make an annual assessment of electrical utility property having a situs in this state. The statute requires that the appraisal and assessment by the department must include the property owned, leased or occupied by a legal entity engaged in a centrally assessed enterprise, even before the particular property "is intended for operation or use in such a business, service or sale of commodity." (ORS 308.515(6).)

ORS 308.517 provides that, with certain exceptions (which have not been raised in these suits), the "Department of Revenue shall assess to the *property user* all property owned, leased, rented, chartered or otherwise held for or used by it in performing a business, * * *" subject to central assessment. (Emphasis supplied.)

Of course, all the "property" defined in ORS 308.510 must be centrally assessed; this "includes all property, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service * * * as set forth in ORS 308.515, * * *." (ORS 308.510(1).) This would include property which was not income producing; *i.e.,* construction work in progress. The department must appraise for the purposes of supplying the county assessor with a figure on which to impose an ad valorem tax; it is not seeking to establish a rate base.

■ An examination of Mr. Arrowsmith's testimony (Tr 723, 731) makes clear that the computed income which he would here capitalize was based upon "funds derived from deferred taxes." As stated above, the court finds no basis for imposing property taxes upon alleged values which are "created" in the plaintiff's bookkeeping as a convenience for rate-making purposes.

Turning now to errors of the defendant alleged by the plaintiff in its Amended Complaint, ¶ VII, *(supra),*

it is believed that only two further matters need be considered: the allegations in plaintiff's paragraph VII (B) and (F) (inasmuch as the court has held that in these suits the customary three approaches to value for public utilities should all be used and that a recomputation of value must be made in accordance therewith, following the court's findings and conclusions).

With reference to Plaintiff's Amended Complaint, ¶ VII (B), no portion of the deferred federal income taxes appearing on the company's books should be used in the stock and debt approach, for reasons set out above.

With respect to Plaintiff's Amended Complaint, ¶ VII (F), consideration must be given to the weight to be accorded to each of the three customary indicators of value. Before abandoning its original report in favor of the income approach only, the defendant assigned a 60 percent weight to the cost indicator, a 30 percent weight to the income indicator, and a 10 percent weight to the stock and debt (or "market data") indicator. As stated in *Assessing and the Appraisal Process, supra,* 166:

> "The final step in the appraisal process is the procedure by which the value indications derived from the three approaches to value are analyzed and the value being appraised is estimated. This procedure is called correlation and final value estimate. Frequently, there will be three separate and distinct value indications, one from each of the three approaches.
>
> "It would be most unusual to have the value indications from the three approaches the same, since real estate appraisal is not a perfect science. At this point in the appraisal process, the assessor must review his work and consider at least these three factors:
>
> 1. The amount and reliability of the data collected in each approach.
>
> 2. The inherent strengths and weaknesses of each approach.
>
> 3. The relevancy of each approach to the subject of the appraisal.

"Each step in the appraisal process and each preliminary value indication must be carefully reviewed. The three indications obtained through the cost, market data and income approaches must be examined with the objective of bringing them closer together, if this is reasonable and logical. It is not defensible to average the value indications, since the assessor is not seeking some hypothetical average value. The purpose of the correlation at this point is to narrow the margin of difference among the approaches and check mathematical calculations.

"After considering these factors, the most relevant approach—cost, market data or income—should receive the most weight. The final value estimate is based upon this decision but is not necessarily restricted to the actual dollar amount resulting from the approach selected. It is usually rounded off and may be somewhat more or less than the value indication specified under this approach. The degree of rounding off in the final value conclusion is based on the degree of accuracy required by the appraisal problem."

In his original appraisal for the defendant on which it based its order of July 10, 1975, Mr. Arrowsmith apportioned a 60 percent weight to the cost approach, 30 percent to income, and 10 percent to stock and debt. He stated that he decided this on the reliability of the various indications of value as they were developed. He testified:

"* * * [I]n companies which are regulated primarily on a historical cost depreciated rate base, the depreciated historical cost is believed to be a very strong indication of value because the amount that the regulatory authorities tend to allow the utilities to make would tend to support this value rather than replacement or reconstruction cost new depreciated. The income indicator — the cost indicator is considered generally the best indicator that we have. The income indicator is subject to a number of — of estimates, adjustments and a general tendency on the part of the department to follow practices which yield to very conservative income indicators of value and I believe that the income indicator is not nearly as good as the cost indicator as an indicator of value. The market data indicator, the stock and debt

[ 238 ]

indicator, is an indicator of value which has been open to question for a number of reasons but is generally used by central assessing authorities as an indication, at least to a certain extent, of the investor's attitude towards the value of the company properties. Based on this and continuing the levels that we have used in the past, my judgment is that the cost indicator is indeed twice as good as the income indicator here and it's certainly substantially better than the market data indicator * * *." (Tr 92-93.)

He testified that the defendant had not always used this rating. (Tr 94.) (And, as noted above, he subsequently depended solely on an income approach.)

Dr. Ring testified respecting the defendant's allocation of weights to the various approaches to value and proposed a substantial change as follows:

"* * * [I]t is my considered opinion that costs in any form for ad valorem purposes do not establish value. In fact no authority, written or spoken, nor any quoted value definition refers to cost as a measure of value. At least cost sets a ceiling of value. By this is meant that no estimate should exceed the cost to obtain a like substitute. * * * Since income as an indicator of value is more important than costs to a willing, ready, able and informed buyer, the applicable judgment weights should be as follows:

60% to the income indicator of value

30% to the cost indicator of value

10% to the stock and debt indicator of value." (Pl Ex 16, 14-15.)

 Dr. Ring's experience and expertise give his arguments greater weight, in the court's view, than those of the defendant. The court believes the use of income as the principal approach is particularly justified because the plaintiff is a permanently regulated utility. The utility earnings are limited, as a matter of law, to its historic cost rate base multiplied by its allowed rate of return. While historical cost less depreciation sets the upper limit of value, such limit does not take into account the effect of regulatory lag

and inflation as does the income approach.[9] Accordingly, for the subject years, the court adopts the weights given the three approaches by Dr. Ring.

*Conclusion.* Each party has relied upon the basic data respecting property found in the FPC Form No. 1 Annual Reports of the plaintiff for 1974 and 1975. These data must be used and the appraisals recomputed for the property tax years 1975-1976 and 1976-1977 in accordance with the court's findings in the foregoing pages. Plaintiff shall prepare a form of decree which shall include computations pursuant to the court's determination of the issues. A copy of the proposed decree shall be submitted to the defendant and the parties shall attempt to agree upon such computation. If the defendant cannot agree on the true cash value of the subject property for the years in issue, based on plaintiff's proposed decree, it shall serve and file a computation believed to be in accord with the court's decision, on or before a time to be set by the court. The court may require briefs or oral arguments before deciding on the proper computation. Tax Court Rule 26.

The form of decree shall require the defendant to make a correct apportionment of the true cash value of the plaintiff's Oregon electric utility property as of January 1, 1975, and January 1, 1976, for the use of the local taxing districts in which the plaintiff's Oregon electric utility property is situated. The decree shall further provide that the county assessor and tax collector of each county to which property values are ascribed shall make the necessary corrections to the assessment and tax rolls for the subject years and that the county commissioners of such counties shall make

---

[9] A recent article on the strength and limitations of the cost approach is by John M. Clapp, *The Cost Approach to Market Value: Theory and Evidence,* 12 Assessors J 43 (Mar 1977). McSpaden, *supra,* n5, at 71 and 76, contends that the income approach most truly reflects the value of the utility company. "This approach is considered one of the most reliable for a public utility, first because the utility is in business to earn an income, and second, because there is a more elaborate quality and quantity of current data available."

refund of overpaid taxes, if any, for such years to the plaintiff, together with statutory interest as provided under ORS 311.806 and 311.812.

Plaintiff is entitled to costs.