# IN THE OREGON TAX COURT

## BYLUND,
*v.*
## DEPARTMENT OF REVENUE
## VALLEY RIVER CENTER,
*Taxpayer-Intervenor*
(TC 1292)

William A. Van Vactor, Assistant County Counsel for Lane County, Eugene, represented plaintiff.

Vernon D. Gleaves, Butler, Husk, Gleaves & Swearingen, Eugene, represented intervenor.

Defendant was not represented.

Decision for intervenor rendered February 9, 1981.

**CARL N. BYERS, Judge Pro Tempore.**

Plaintiff appealed to the defendant from a determination by the Lane County Board of Equalization regarding the assessed valuation of the subject property. The subject property is a regional shopping center known as Valley River Center. The defendant made no determination of the issue after 12 months; therefore, the plaintiff elected to treat the appeal as denied (ORS 305.560(5)) and made this appeal to the tax court. Valley River Center, a partnership owning the shopping center, has intervened as defendant.

By prior stipulation, the parties agreed that the shopping center should be valued using the income approach. Based upon an agreed net income and capitalization rate, the parties have stipulated to a value for the shopping center, except in one particular. The one area of disagreement is the value of the tenant improvements over and above the landlord's allowance.

The taxpayer offers both a "standard" lease and a "shell-plus allowance" lease with the latter predominating among the current tenants. Under the terms of the shell-plus allowance lease, the landlord pays for the tenant's improvements up to a certain amount, usually $6 per square foot. The tenant's costs often exceed the allowance and the additional costs of improvements are borne solely by the tenant. Under the standard lease, the tenant is required to pay for all improvements.

Under both types of leases, the landlord retains the right of reversion to all improvements at the termination of the lease or has the right to require the lessee to remove the improvements.

The plaintiff argues that the value of the tenant improvements is not included in the income which is being used to measure the value of the shopping center. Plaintiff's argument is as follows: since the rent is established without regard to the amount spent by the tenant on improvements, the income approach fails to include the value of such improvements. Consequently, it is necessary to value the tenant improvements by the cost approach and to add that value to the value determined by the income approach. Plaintiff also argues that the tenant improvements have substantial value and can be transferred or sold by the tenant.

On the other hand, the taxpayer contends that the value of the tenant improvements is included in the rental income. Taxpayer argues that the rental income is a function of gross sales as well as a base rent. A tenant seeks a "customized" image which is unique or special to its business. Leasehold improvements are installed to create this image and the value of the improvements is reflected in the tenant's gross sales. However, since each business is different, the improvements of one tenant have little or no value to another tenant. Therefore, whatever value the specialized tenant improvements have is reflected in the income which the business produces.

Plaintiff's position raises the question of whether it is proper to mix an income approach and a cost approach in determining the value of property.

The Department of Revenue's rule, OAR 150-308.205-(A)(2), states that:

> "* * * Any one of the three approaches to value, or all of them, or a *combination of approaches,* may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances." (Emphasis supplied.)

This sanctioned "combination" of approaches has resulted in cases where the department has used "weighted" approaches. In *Pacific Power & Light Co. v. Dept. of Rev.,* 7 OTR 203 (1977), the appraiser used three approaches to value

but certain circumstances caused him to accord only ten percent weight to the stock and debt approach, 30 percent to cost and 60 percent to the income approach.

In *Burlington Northern et al v. Dept. of Rev.*, 8 OTR 19 (1979), the expert appraiser offered three approaches but chose to give no weight to his stock and debt approach, 30 percent to cost and 70 percent to the income approach. Therefore the expert weighted the cost and income figure to find a correlated true cash value.

However, mixing or combining approaches of appraising is not the same as "correlation." The process of correlation in an appraisal process is defined as follows:

"* * * The appraiser makes a thorough study of all pertinent information gathered by him, and analyzes and weighs the strongest and most applicable data under each approach. The final conclusion as to value is based on the approach which is supported by the most convincing data, that is, the *primary* approach. The accuracy of this estimate is checked by the results reached under the other approaches used, the *secondary* approaches." (Emphasis in original quotation.) *Encyclopedia of Real Estate Appraising* 120 (E. Friedman, ed., rev & enlarged ed 1968).

In American Institute of Real Estate Appraising, *The Appraisal of Real Estate* 72 (7th ed 1978), under the heading "Reconciliation of Value Indications," the author states:

"The final step in the appraisal process is the consideration of the indicated value resulting from each of the three approaches to derive a final estimate of the defined value. Under no circumstances are these 'averaged.' To do so would be as illogical as asking three persons for the right time and averaging the three replies. The appraiser considers the relative dependability and applicability of each of the three approaches in reconciling the three value indications into a final estimate of defined value."

This court quoted the American Institute of Real

Estate Appraisers, *The Appraisal of Real Estate* 60-61 (5th ed, 1967), in *Pacific Power & Light Co., supra*, at 215:

" 'In the majority of his assignments, the appraiser utilizes all three approaches. Occasionally he may believe the value indication from one approach will be more significant than from the other two; yet he will use all three as a check against each other, and to test his own judgment. * * *' "

In addition, at 216:

" '* * * Correlation quite literally means bringing together the facts and fitting them together to conform to cause and effect relationships. * * *

" '* * * In the end, the indicated value estimates are correlated to reach the final estimate of value.' "

From the above, it would appear that if the income of a property does not accurately measure the whole of the property, then perhaps another approach should be used. It is possible that if the portions of the property not included in the income are ascertainable or severable, a separate approach could be used to value that portion of the property.

For example, assume that a building shell with bare walls would rent for 50 cents a square foot, unimproved, but would rent for $1.25 per square foot improved. If the building is rented by a tenant for 50 cents per square foot and the tenant then installs all the necessary improvements, it is clear that the rent at 50 cents per square foot does not include the value of the tenant's improvements. The standard solution to this problem is to look to other comparable property which is improved and determine the fair market value rent for the improved space. There is apparently nothing in logic or appraisal theory which would preclude the appraiser from utilizing the 50 cents per square foot income to value the bare shell and the cost approach or the market data approach to ascertain the value of the improvements. However, it is clear that the validity of such an approach would depend upon the appraiser's ability to *correlate* the resulting figures to arrive at an estimate of market value. As indicated above, merely

adding the "values" of the two approaches would not necessarily result in an indication of overall market value.

■     In this case, the burden of proof is on the plaintiff to prove that the value of tenant improvements is not reflected in the reported income generated by all the property. The plaintiff offered no evidence to show that improved space commanded a higher rent than unimproved space. Moreover, plaintiff's witness admitted that he was unaware of the negotiation factors or how the amount of rent is arrived at. The preponderance of the evidence was to the effect that tenant improvements were not a factor in determining rent. Further, plaintiff offered no comparison of tenants' sales-rent ratio to the sales-rent ratio of similar business operations. If the actual rent paid (minimum plus percentage of gross sales) was lower than the rent for similar space by similar business operations, such evidence would indicate that the subject rent payments were not economic and therefore the value of the tenant improvements was not reflected in the income stream. Without some comparison data, there is no basis for the court to conclude that the rental income did not accurately reflect the value of the improvements.

A study of tenant leases found in Plaintiff's Exhibit 2 reveals that the cost of tenant improvements range from 87 cents per square foot to $29.87 per square foot. In addition, Plaintiff's Exhibit 2 presents evidence that in a space rented to the "Party Card Shop," the lessee expended $11.87 per square foot for tenant improvements. Six years later the same space was leased to a similar enterprise, "Mark's Hallmark Shop," and the new lessee made improvements equal to $5.25 per square foot. This evidence is supportive of the taxpayer's contention that tenant improvements are customized to maintain an image, which image may have little or no value for a new lessee. Based upon the evidence submitted, it appears that tenant improvements as a general rule have little or no transferable value. This finding tends to support the taxpayer's position that the cost of such improvements is not necessarily an indication of their value.

The court finds that, in view of the evidence presented in this case, it is not proper to add the cost of tenant improvements to the stipulated estimate of total value determined by the income approach. Therefore, the 1977-1978 assessment rolls should reflect the stipulated values as follows:

| Account No. | Land Value | Improvement Value | Total |
|---|---|---|---|
| 979227 | $2,356,150 | $13,353,790 | $15,709,940 |
| 249852 | 119,960 | --- | 119,960 |
| 249902 | 174,950 | 74,730 | 249,680 |
| 1083011 | 754,610 | 1,170,490 | 1,925,100 |